THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROY FLUKER, Defendant-Appellant.

First District (1st Division)    No. 1—98—3648

Opinion filed December 26, 2000.

Rita A. Fry, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Nancy Colletti, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

Once again we must decide whether a prosecutor's closing argument requires reversal of a murder conviction. We find that the argument here improperly directed the jury's attention away from the issues. Because we find the evidence closely balanced, we cannot consider the error harmless. Thus, we reverse and remand for a new trial.

Around 10 p.m. on November 15, 1995, Charinida Willford sat on the steps of a house near her home, talking with Tasha Stinson and some other friends from the neighborhood. A bullet from across the street passed close by Stinson's head, and a shotgun blast killed Willford. Stinson told police she saw two black men dressed in black in a gangway across the street. She did not further describe the men. Police found spent cartridges in the gangway, but not outside the gangway.

About a month later Detective Richard Curley interviewed Tyrone

Baldwin concerning an unrelated matter. Following that interview, Curley went to see Stinson. She told him she saw the two shooters come out of the gangway before they began shooting. She had seen one of the men several times in the neighborhood. When Curley showed her an array of photographs, she chose a picture of defendant Roy Fluker. Later, she identified defendant in a lineup as the person she saw shooting a handgun on November 15, 1995. Police then charged defendant with the first-degree murder of Willford and the attempted murder of Stinson.

In discovery defense counsel learned that, before Curley went to interview Stinson, Baldwin had identified defendant as the shooter. Some months later Baldwin went to the office of the public defender, where he wrote out a statement concerning his conversation with Curley. He denied making any identification of the shooter, saying that he did not see who shot the guns. He said Curley asked him if he knew that defendant had shot Willford, and Baldwin told Curley he did not know that.

At trial Stinson testified that she, Baldwin and Willford were talking with Donald and Derrick Acker and two other persons outside on November 15, 1995. When she saw a red beam land on her she immediately got down to the floor of the porch, just as the shooting began. She said she did not look to see where the beam came from. But later during the questioning she said that, before she got down, she looked up and saw two men dressed in black, one holding a handgun, in the gangway across the street. She admitted that she told Curley she had seen defendant shooting.

Stinson testified that after the shooting she and Baldwin saw a white Oldsmobile less than a block away. She had previously seen defendant driving that car. At first she said that she never told police the man she had seen in the car was the same as the man she saw shooting, but later she contradicted that testimony. She said she did tell police the man she had seen in the car was the same as the man she saw shooting.

The prosecuting attorney, Laura Morask, asked Stinson whether she had refused to come to court at an earlier stage of the proceedings. Stinson admitted that she had not come, because her "life could be in danger." Some people she saw on the street asked her if she was going to testify against defendant. She told them she would not. She testified that she told the truth in her written statement to police; in that statement she said she saw defendant shoot at her group.

At the conclusion of cross-examination, the court asked for clarification:

"Q. To be clear, is it your testimony today that you saw or did

not see the defendant Roy Fluker at or in the gangway where the shooting came from?

A. Did not see.

Q. Did not see. Secondly, is it your testimony today that you saw or did not see the defendant Roy Fluker at or in the white Oldsmobile on the night of the shooting?

A. I did not see him in the white Oldsmobile, true, or did not shoot."

But on further examination by the prosecutor, Stinson reiterated that she told Curley the truth. She said she saw defendant outside on the night of the shooting, but she did not remember where. The prosecutor reminded her of what she told Curley. Stinson answered that she could not say whether she saw defendant shooting. The court asked her why. She said, "I have kids that live there."

An assistant State's Attorney testified that he spoke with Stinson before trial. She said she told Curley the truth, but she said that she would not identify defendant at trial as the shooter because, in the assistant State's Attorney's words, "she has three children; two of the children from three separate fathers, and two of the fathers have been killed already from gang violence and there is no way that she was going to jeopardize the life of her other children to identify [defendant] in court." The assistant State's Attorney clarified that Stinson said she "was afraid of Roy Fluker or the people that he knows and associates with directly coming to her family and putting harm to her family."

A police officer testified that in November 1995 the Unknown Vice Lords were rivals of the Four Corner Hustlers in a struggle for control of areas for sales of narcotics.

Baldwin testified that he and the Acker brothers belonged to the Unknown Vice Lords, rivals of the Four Corner Hustlers. He saw the red beam coming from the gangway, then he saw two men in the gangway. One man looked like defendant, but Baldwin said that the man was "just a look alike." He saw the man come out of the gangway holding a handgun, along with another man holding a shotgun. Baldwin ran, looking back, as the men started shooting. On cross-examination Baldwin agreed that the man he saw holding a handgun "looked like Roy but wasn't Roy."

On direct examination Baldwin swore that about a half hour after the shooting he and Stinson saw a white Oldsmobile parked in the area. Defendant and another man approached the car. The other man broke the window, then defendant got in the car and drove off. Baldwin had never seen defendant drive that car before.

Baldwin admitted that he spoke to Curley about a month after the

murder. After Curley finished interviewing him about another matter, Baldwin volunteered that he witnessed Willford's murder. Baldwin picked defendant's picture from a photo array, and later he identified defendant in a lineup as the person he saw shooting a handgun on November 15, 1995.

The prosecutor asked Baldwin about the statement he wrote out for the public defender. Baldwin said he went to the defender's office in response to a subpoena, and he stayed in the office for two hours because the attorneys would not let him leave. They treated him as though he were on trial. He wrote what the attorney wanted so he could leave. Baldwin admitted that he did not have the subpoena. His mother received it and told him about it.

Toward the end of his testimony he reiterated that he did not know who shot at him, but the man looked like defendant. He admitted that he told police he saw defendant shooting the handgun on November 15, 1995.

Curley corroborated most of Baldwin's trial testimony concerning their discussion in the police station. Curley added that Baldwin told him he knew defendant was a member of the Four Corner Hustlers, and Baldwin recognized the white Oldsmobile as defendant's car.

Curley also recounted his interview with Stinson. She told Curley she recognized one of the shooters as a member of the Four Corner Hustlers. When Curley showed her the photo array she immediately selected defendant's photograph, and she identified him in the lineup as the shooter she saw. She also told Curley she saw defendant by the white Oldsmobile about a half hour after the shooting.

Following the lineup, Curley asked defendant if he had any tattoos. Defendant showed him a tattoo of the number 4. Curley testified that the symbol indicated membership in the Four Corner Hustlers.

Donald and Derrick Acker both testified that they ran once the shooting began. They both looked back toward the source of the gunfire but saw no one—the shots came from inside the gangway. They were both members of the Unknown Vice Lords, and Donald admitted that the Four Corner Hustlers sometimes counted as their rivals.

An attorney working for the public defender testified that office records showed the office sent Baldwin no subpoena. The attorney spoke with Baldwin at length when he came to the office. Baldwin did not ask to leave, no one told Baldwin he could not leave, and all doors remained unlocked. Baldwin told the attorney that the police report misrepresented his conversation with Curley. In particular, Baldwin never said he could recognize either shooter, and he never said he saw defendant shooting.

In closing argument defense counsel suggested that Baldwin may have decided to lead police to suspect defendant, a member of a rival gang, as a shooter here both to hurt the rival gang and to curry favor with police. Baldwin then needed only to persuade Stinson to help him with the plan. Stinson feared not only defendant's gang, but Baldwin's gang, too. Baldwin recanted at trial because his conscience bothered him.

The prosecutor argued in rebuttal:

> "The only issue in this case is not is this a mistaken identity; do we have the right guy? That is not the issue. The only issue is who do you want to control our criminal justice system?"

The court overruled defense counsel's objection. The prosecutor continued:

> "Who do you want to control our society? Who do you want to make the laws and to order us to follow the laws and live in an orderly society? Do you want the Judge and you jurors to control our criminal justice system or do you want Roy Fluker to control the criminal justice system? Do you want the people who pay their taxes, write out their real estate tax bills, and all of the good citizens who are able to live a law-abiding life to control society or do you want his friends; the Four Corner Hustlers to control our society?"

Again the court overruled defendant's objection. So encouraged, the prosecutor argued:

> "Do you want a society that is ruled by fear and intimidation; by people that make a mockery of what should be your job to determine justice and to live in a law-abiding society? *** [L]etting this guy go because he was able to instill fear into Tasha Stinson; letting this guy go because he was able to finagle the shenanigans with these subpoenas and these mysterious people popping up here; popping up there; if he's able to finagle all of this, let him go. Let him walk out that door and make a mockery of you; a mockery of the Judge."

To this, the judge sustained an objection and reminded the jurors that "there has been no direct testimony that Mr. Fluker engaged in intimidation."

The prosecutor hypothesized that Baldwin's conscience bothered him after he saw Willford shot:

> "Not all gangbangers have absolutely no conscience. *** When gangbangers creep out there under cover of dark they're not suppose[d] to hit children and innocent targets. That even violates their own code."

The court overruled an objection based on the lack of evidence. The prosecutor suggested that Baldwin must have been afraid of testifying,

but "he can't show that fear. A gangbanger doesn't show fear certainly not in front of rival gangbangers, but it's also the unwritten code of gang conduct." Again, the court overruled an objection.

The prosecutor continued:

"[E]ven if you're a rival, you're still violating a gang rule if you point out a gang member in court."

The court sustained an objection and pointed out that the prosecutor presented no evidence of any gang rules.

The prosecutor then discussed the testimony in court of Stinson and Baldwin and the inconsistencies with the out-of-court statements. She said:

"What is the defense here? There is no defense. Is it mistaken identity? Did anybody come on that stand and say that man didn't do it?"

The judge overruled the objection, but he also reminded the jury that the burden of proof does not shift to the defense. The prosecutor said, "Did you hear Tasha and Tyrone say that is not the guy?" After another overruled objection, she said, "They didn't say that is not the guy at all."

The prosecutor soon returned to her original theme:

"The bottom line is who runs this courtroom?

[Defense counsel]: Objection.

THE COURT: Overruled.

MS. MORASK: Do you run it or do they run it? Do you want to let him go; let him walk out that door? You may as well give him a robe. You may as well give him a robe and a gavel and make him a Judge—

[Defense counsel]: Objection.

MS. MORASK:—because he's the arbiter of who's guilty and who's not."

Although the court sustained the objection, the prosecutor went on:

"Well, you know that the Four Corner Hustlers will control the City as well as all the other gangs if you allow them to make a mockery of the justice system. *** You can't let them make a mockery of you."

The court again sustained an objection. The prosecutor concluded that Willford's mother had to "live each and every day with the knowledge that her little girl; her twenty-one year old baby, walked out that door merely to go across the street and ended up about an hour and a half later lying in an alley riddled with buckshot wounds *** and said [']I'm not ready to die.[']"

Over defendant's objection, the court instructed the jury:

"A person who is legally responsible for the conduct of another

may be convicted for the offense committed by the other person even though the other person, who it is claimed committed the offense, has not been prosecuted."

The jury found defendant guilty of the first-degree murder of Willford and the attempted murder of Stinson. After denying the motion for a new trial, the court sentenced defendant to concurrent terms of 37 years for the murder and 30 years for the attempt.

■ On appeal defendant first contends that Stinson's statements to Curley cannot be considered as substantive evidence, and thus the admissible evidence failed to prove the identity of the shooter. Section 115—10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—10.1 (West 1994)) permits the use of prior inconsistent statements as substantive evidence if "the witness is subject to cross-examination concerning the statement, and *** the statement *** narrates, describes, or explains an event *** of which the witness had personal knowledge, and *** the witness acknowledged under oath the making of the statement."

■ Here, defense counsel ably cross-examined Stinson concerning her out-of-court identification of defendant as the shooter. The statement described the shooting Stinson witnessed. And, under oath, she acknowledged that she told Curley the truth about the shooting. She even acknowledged that she told Curley she saw defendant shoot. Although she equivocated on much of her testimony, we find sufficient support for the trial court's decision to permit use of the statements as substantive evidence that Stinson saw defendant shooting. See *People v. Hastings*, 161 Ill. App. 3d 714, 720, 515 N.E.2d 260 (1987).

■ When a defendant challenges the sufficiency of the evidence, this court must defer to the findings of the trier of fact, who saw and heard the witnesses. *People v. Jefferson*, 24 Ill. 2d 398, 402, 182 N.E.2d 1 (1962). But if the evidence is so unsatisfactory as to leave a reasonable doubt of the defendant's guilt, we must reverse the conviction. *People v. Schott*, 145 Ill. 2d 188, 206-07, 582 N.E.2d 690 (1991). For example, the appellate court reversed the conviction in *People v. Ephraim*, 133 Ill. App. 2d 310, 273 N.E.2d 225 (1971), because of substantial inconsistencies in the testimonies of prosecution witnesses, and because the testimony showed the witnesses had, at best, a minimal opportunity to view the offender at the crime scene. There, a key witness testified that he recognized defendant at the scene, and he knew defendant from the neighborhood. But the defense showed that the witness told police at the scene that he recognized only one of the offenders, and he named someone other than the defendant.

■ Similarly, Stinson here told police at the scene she saw two black men dressed in black; she gave no further description. Other

witnesses at the scene, like the other witnesses in *Ephraim*, said they had no opportunity to see the offenders. The location of the cartridges supports their testimony that the gunmen never stepped forward out of the gangway. Baldwin at trial testified that he saw the shooters step forward from the gangway as they began to shoot. One looked like defendant, but Baldwin was not sure who it was. On a direct question from defense counsel, Baldwin said defendant was not the shooter. But he admitted he told police he saw defendant shoot.

While this case presents a very close question concerning the sufficiency of the evidence, we hold that the jury could find the out-of-court statements of Stinson and Baldwin more credible than their testimony at trial. See *People v. McBounds*, 182 Ill. App. 3d 1002, 1014-15, 536 N.E.2d 1225 (1989). Out-of-court identifications alone may establish guilt, even if recanted at trial. *People v. Bailey*, 265 Ill. App. 3d 262, 276-77, 638 N.E.2d 192 (1994). Stinson and Baldwin looked toward the gangway at a different angle from that at which the Ackers saw the shooting, and the Ackers had to look backward as they ran away from the gunfire to see the offenders. The streetlight could have given Stinson and Baldwin a brief, but sufficient, opportunity to see the offenders even if the offenders remained at the mouth of the gangway. Accordingly, we hold that the prosecution presented evidence that could support the convictions.

■ We reverse and remand for a new trial due to the pervasive misconduct of the prosecutor in rebuttal argument. While courts permit prosecutors wide latitude in closing argument, "it is improper for the prosecutor to do or say anything in argument the only effect of which will be to inflame the passion or arouse the prejudice of the jury against the defendant, without throwing any light on the question for decision." *People v. Smith*, 141 Ill. 2d 40, 60, 565 N.E.2d 900 (1990). Under general ethical principles:

> "The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict." *People v. Martin*, 29 Ill. App. 3d 825, 829, 331 N.E.2d 311 (1975).

■ Here, with the opening thrust of rebuttal argument, the prosecutor not only failed to throw light on the issues in the case, she actively distracted the jurors from the issues. The jury needed to decide, first and foremost, whether Baldwin and Stinson had an adequate opportunity to see the offender and, if so, whether to believe their out-of-court statements naming defendant as one of the shooters. But the prosecutor turned the jury's attention away from the issues in

an effort to turn the case into a referendum on attitudes toward gangs. She misinformed the jury:

> "The only issue in this case is not is this a mistaken identity \*\*\*. The only issue is who do you want to control our criminal justice system? \*\*\*
>
> * * *
>
> \*\*\* Do you want \*\*\* the Four Corner Hustlers to control our society?"

The trial court exacerbated the error by overruling defendant's prompt, appropriate objections. *People v. Kidd*, 147 Ill. 2d 510, 544, 591 N.E.2d 431 (1992). The court's action reinforced the direction of the jury's attention away from the identification of the shooter to disapproval of the power of gangs.

Similar comments later in the argument, about giving defendant a robe and permitting him to make a mockery of the justice system, further misdirected the jury from determination of the issues. See *People v. Fletcher*, 156 Ill. App. 3d 405, 411-12, 509 N.E.2d 625 (1987). By persisting in the comments even when the court sustained objections, the prosecutor undercut the salutary effect of those rulings. *Fletcher*, 156 Ill. App. 3d at 411. Also, the evidence provided no support for the prosecutor's speculation concerning gang rules. See *Martin*, 29 Ill. App. 3d at 829.

The prosecution argues that defendant invited the improper remarks by suggesting that Baldwin might have decided to name a plausible member of the rival gang as the shooter, and Baldwin could have persuaded Stinson to support the identification. We do not see how the defense theory of a motive for misidentification invited the prosecution to direct the jury's attention away from the issue of identification of the shooter and to turn the trial into a referendum on gangs. The defense theory concerning the issues in the case did not invite a purely inflammatory response directing the jury to ignore the issues. See *People v. Ray*, 126 Ill. App. 3d 656, 660, 467 N.E.2d 1078 (1984).

■ Defendant also objected to the prosecutor's question, "Did anybody come on that stand and say that man didn't do it?" The judge attempted to clarify that the prosecutor could discuss the testimony of prosecution witnesses. But the judge, by overruling the objection, allowed the prosecution to give the jurors the impression that defendant should have brought in a witness to say he was not the shooter, especially because the prosecutor repeated the comment in various forms after the court overruled the objection. See *People v. Adams*, 281 Ill. App. 3d 339, 346, 666 N.E.2d 769 (1996). The remarks improperly shifted the burden of proof to defendant. See *Adams*, 281 Ill. App. 3d

at 346. Moreover, the prosecutor misstated the evidence when she said the witnesses never testified that defendant was not the shooter. In fact, Baldwin at one point testified that the shooter looked like defendant, but he was not defendant. See *People v. Linscott*, 142 Ill. 2d 22, 38, 566 N.E.2d 1355 (1991).

The case presented a very close question concerning the credibility of the out-of-court identifications of defendant as the shooter. Considering the cumulative effects of the improper comments in this close case (see *People v. Roach*, 213 Ill. App. 3d 119, 125, 571 N.E.2d 515 (1991)), we find that the jury may have reached a different result without the remarks, so the improper remarks constituted a material factor in the conviction. See *People v. Montefolka*, 287 Ill. App. 3d 199, 212, 678 N.E.2d 1049 (1997). Accordingly, we reverse the convictions and remand for a new trial.

■ Defendant raises two further issues that may arise on retrial. First, he contends that the prejudicial effect of evidence of gang affiliation far outweighs its probative value. Evidence of gang activity is admissible to provide a motive for an otherwise inexplicable act, or if it is relevant to any other issue in dispute, as long as its prejudicial effect does not substantially outweigh its probative value. *People v. Matthews*, 299 Ill. App. 3d 914, 922, 702 N.E.2d 291 (1998).

Here, three witnesses in the group fired upon admitted that they belonged to the Unknown Vice Lords, and two of them admitted the gang had a rivalry with the Four Corner Hustlers. A police officer testified that the two gangs competed for control of narcotics trafficking areas. Curley identified defendant's tattoo as an insignia of membership in the Four Corner Hustlers. We find the evidence related to the motive for an otherwise inexplicable act. It also helped explain Stinson's apparent fear of testifying. While the evidence of gang affiliation has substantial prejudicial effect, it also has substantial probative value. The trial court did not abuse its discretion by permitting the jury to hear the testimony pertaining to gangs. See *People v. Carson*, 238 Ill. App. 3d 457, 465, 606 N.E.2d 363 (1992).

■ Finally, defendant contends that the court erred by instructing the jury that defendant could be legally accountable for the actions of another person, even if that person "has not been prosecuted." On remand the prosecution should present evidence concerning the status of the investigation into the identity of the man with the shotgun. If the evidence shows that the prosecution has not brought anyone to trial on the charge of shooting the shotgun which killed Willford, the trial court should repeat the instruction it gave here. See *People v. Spain*, 285 Ill. App. 3d 228, 238, 673 N.E.2d 414 (1996).

The court properly allowed the jury to consider Stinson's out-of-

court statements as substantive evidence that she identified defendant as the man she saw shooting a handgun when a shotgun blast killed Willford. The out-of-court statements sufficed to support a verdict finding defendant guilty of attempted murder and as an accomplice to murder. The trial court properly admitted evidence of defendant's gang affiliation and the gang affiliations of persons in the group with Willford, along with evidence of the rivalry between the two gangs. But the prosecutor's extensive improper remarks directing the jury's attention away from the issues in the case require reversal.

Reversed and remanded.

O'MARA FROSSARD and COHEN, JJ., concur.