THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERTO ABADIA *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 1—99—2023, 1—99—2685 cons.

Opinion filed November 13, 2001.—Rehearing denied April 19, 2002.

COUSINS, J., specially concurring.

Thomas Peters, of Chicago, for appellants.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, Alan J. Spellberg, and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE COHEN delivered the opinion of the court:

On February 25, 1999, after a jury trial, defendants Roberto Abadia and Octabio Arias were convicted of first degree murder (720 ILCS 5/9—1(a)(1) (West 2000)), attempted first degree murder (720 ILCS 5/8—4, 9—1 (West 2000)), aggravated battery with a firearm (720 ILCS 5/12—4.2(a)(1) (West 2000)) and armed violence (720 ILCS 5/33A—2, 12—4(a) (West 2000)). Defendants were each sentenced to consecutive prison terms of 90 years for first degree murder and 10 years for attempted first degree murder. Defendants' appeals were consolidated. Arias argues that: (1) there was insufficient evidence to support his convictions; (2) a new trial is required because inadvertently the jury was not sworn until the second day of trial; (3) a new trial is required because of prosecutorial misconduct during rebuttal argument; and (4) the 90-year sentence should be reduced because it is excessive and unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Abadia was granted leave of court to adopt the four arguments raised by Arias on appeal. In addition, Abadia argues ineffective assistance of counsel predicated on his attorney's failure to present a defense at Abadia's trial. We hold that the evidence was sufficient to convict the defendants and that the

short time the jury was unsworn did not prejudice the defendants. However, we find the prosecutor's comments in rebuttal were improper and resulted in substantial prejudice to the defendants. As we cannot confidently state that the trial was fundamentally fair, we reverse the defendants' convictions and remand the case for a new trial. We need not address the remaining issues raised on appeal.

## BACKGROUND

The evidence adduced at trial reveals that at 4 a.m. on June 20, 1995, defendants traveled in a white Ford Taurus to an isolated dirt road in an industrial area. The area is adjacent to a freight train railroad crossing at 122nd Street in the City of Chicago. Mr. Robert Terry, a locomotive engineer, was seated in the cab of a train stopped approximately 75 feet north of the 122nd Street crossing. As Terry was preparing to move the train, he saw the white Ford Taurus containing a driver and passengers drive over the tracks twice before turning south onto the dirt road adjacent to the tracks. The locomotive's lights were set to "dim," illuminating the area a quarter of a mile ahead of the engine car. Terry lost sight of the Taurus on a dirt road because the road was lower than the tracks and surrounded by six-foot-tall marsh reeds. Within a few minutes, Terry heard both large and small caliber gunshots. The police would later find Luis Arce's body, surrounded by used bullet shell casings, at the edge of the dirt road near the tall reeds. When his body was discovered, there were two bullet holes in the back of Arce's head and seven other bullet wounds to his body.

Terry heard yelling from the same area from which the first sets of gunshots had emanated. He then heard more gunshots which sounded as if the shooter was drawing near. A few seconds later, Terry saw a young Hispanic man sprint diagonally northeast from the access road across the tracks to the eastern side of the train. Terry then saw the defendants running after the young man while firing their handguns. As the defendants crossed 122nd Street and the adjacent set of train tracks, Terry turned all of his locomotive lights to the "bright" setting, illuminating the area up to 1 3/4 miles ahead of the engine car. Startled by the bright lights, the defendants stopped, looked up at the locomotive and then ran back to the white Taurus, which had backed out of the dirt road, and followed the defendants to the paved railroad crossing.

Terry observed the driver as defendants scurried into the car. Defendants drove toward Torrence Avenue on 122nd Street. Terry called for help on his radio and spoke to railroad police officer Mark Postma. Terry told Officer Postma of the gunshots, described the vehicle, indicated its direction of travel and described the passengers. While Officer Postma was responding to the radio call for help, a

young man, who Terry "figured it [sic] was the guy that had been shot at," approached Terry's locomotive from the northwestern side of the train after the Taurus departed. Terry thought the young man would have had to "crawl under" his train to approach the cab from the northwest because the train extended a mile and a half behind Terry's engine car. The young man, later identified as Gabrielle Gonzales, told Terry that he was hurt and that he needed an ambulance. Terry told Gonzales to sit down because Gonzales' intestines were protruding from his body and he was bleeding. Terry observed Gonzales turning white as if "he was going into shock." Both an ambulance and Chicago police officers arrived at the scene within 15 to 20 minutes.

Officer Postma drove his unmarked police car to the intersection of Torrence and 130th Street, where he saw the white Ford Taurus described by Terry. The white Taurus was the only other car on the road at the intersection. Officer Postma observed the three passengers and followed the car onto the Dan Ryan expressway. At the same time, he contacted the Illinois State Police. Detective Neil Maas of the Chicago police also responded to Officer Postma's radio communication. With the assistance of Officer Postma and Illinois State Trooper Tim Drozd, Detective Mass executed a traffic stop of the car on the expressway near 86th Street. Detective Maas then transported the defendants and the driver of the Taurus to the Area 2 police station. When arrested, the defendants were wearing the same clothing described by Terry at the scene of the crime. Terry identified the defendants later that same day from a lineup.

The defendants were convicted of first degree murder (720 ILCS 5/9—1(a)(1) (West 2000)), attempted first degree murder (720 ILCS 5/8—4, 9—1 (West 2000)), aggravated battery with a firearm (720 ILCS 5/12—4.2(a)(1) (West 2000)) and armed violence (720 ILCS 5/33A—2, 12—4(a) (West 2000)). Defendants were each sentenced to consecutive prison terms of 90 years for first degree murder and 10 years for attempted first degree murder. This appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

■ "[W]hen reviewing the sufficiency of the evidence in a criminal case, the proper standard of review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Lamborn*, 185 Ill. 2d 585, 590, 708 N.E.2d 350, 353-54 (1999). The function of this court is not to retry the defendant. *People v. Digirolamo*, 179 Ill. 2d 24, 43, 688 N.E.2d 116, 125 (1997). "Circumstantial evidence is sufficient to sustain a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Campbell*, 146 Ill. 2d 363, 379, 586

N.E.2d 1261, 1268 (1992). " '[D]eterminations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact.' " *People v. Emerson*, 189 Ill. 2d 436, 475, 727 N.E.2d 302, 324 (2000), quoting *People v. Nitz*, 143 Ill. 2d 82, 95, 572 N.E.2d 895, 900-01 (1991). The trier of fact may consider inferences that flow naturally from evidence presented in court; however, the trier of fact is not required to "search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Campbell*, 146 Ill. 2d at 380, 586 N.E.2d at 1268.

■ Defendants argue that Terry is unreliable as an eyewitness because he saw individuals matching the defendants' appearance for only a few seconds from 75 feet away and he testified to events inconsistent with the physical evidence at the crime scene. The defendants argue that the locomotive's lights were on the "dim" setting and it is improbable under the circumstances for Terry to have observed sufficient details to make a reliable identification of the defendants. However, the record reflects that Terry turned his locomotive's lights to the "bright" setting after he had observed the defendants run approximately 50 feet from the entrance of the dirt road to the railroad crossing in front of the locomotive. The defendants stopped running and looked up at the cab where Terry was sitting after Terry had already activated the bright lights. The record shows Terry gave an accurate description of the defendants to the police officers shortly after he witnessed the events. Determinations of credibility by the trier of fact are accorded great deference by a reviewing court, and we will not disturb this determination. *People v. Wittenmyer*, 151 Ill. 2d 175, 191, 601 N.E.2d 735, 743 (1992).

Defendants attempt to fortify their unreliability argument by stating that Terry's testimony is inconsistent with the physical evidence. Specifically, defendants argue that Terry testified the defendants were firing their pistols at Gonzales and that Gonzales returned fire with his pistol while he ran away from the defendants. Defendants argue that because the police failed to recover any weapons or shell casings from the area between the entrance to the dirt road and the locomotive and also failed to recover any weapons or casings from the white Taurus, Terry's testimony is unreliable.

The absence of bullet shell casings, except for those surrounding Luis Arce's body, as well as the absence of any weapons, does not indicate that Terry's testimony is unreliable. The record contains testimony that Terry observed Abadia with a "chrome-plated revolver" and Arias with a "bluesteel or black pistol." Neither weapon was recovered by the police. The record contains no indication whether defendant Arias used a revolver, a semiautomatic or an automatic

weapon. Police officer Patrick Moran, who works as an evidence technician with the crime scene processing section of the Chicago police crime lab, testified that shell casings are mechanically ejected from automatic and semiautomatic weapons after each bullet is fired and that shell casings from a revolver must be manually removed. Without evidence as to whether automatic or semiautomatic weapons were used to shoot Gonzales, the defendants have no evidence to support the conclusion that shell casings should be found near the railroad crossing. Similarly, the failure of police to recover any weapons or shell casings from the white Taurus does not vitiate the reliability of Terry's eyewitness testimony. As the record contains no evidence that the guns were ever fired inside the car, there is nothing to support an inference that shell casings or weapons would be found inside the car.

Although the defense attempted to impeach Terry with a police report stating that Terry saw Gonzales turn toward the defendants with an outreached arm as if he had a weapon, the record reveals that Terry clarified his testimony by stating at trial that he did not see a gun in Gonzales' hand. While defendants persist in arguing on appeal that Gonzales had a weapon, whether Gonzales possessed a weapon is a credibility determination, which we will not disturb here. *Emerson*, 189 Ill. 2d at 475, 727 N.E.2d at 324.

We find Terry's testimony at trial was consistent with the facts in the record. Defendants cannot point to any evidence in the record to support their argument that Terry's testimony is inconsistent with the physical evidence. Defendants fail to show Terry's testimony is unreliable. Thus, after viewing the evidence in the light most favorable to the State, we are convinced that a rational trier of fact could have found the elements of the crimes beyond a reasonable doubt. *Lamborn*, 185 Ill. 2d at 590, 708 N.E.2d at 353-54.

## II. Unsworn Jury

Defendants argue that while the court did timely instruct members of the jury on the trial process and their duties, the court inadvertently allowed the jury to hear a full day of testimony before the court administered the juror's oath to the jurors. Defendants seek a new trial based on this one-day delay.

■ Defendants raise this issue for the first time in this appeal. "Issues not raised at trial and not presented in a written post-trial motion are ordinarily deemed waived on review." *People v. Hicks*, 181 Ill. 2d 541, 544, 693 N.E.2d 373, 375 (1998). However, the issue raised by defendants is unusual and "the goals of obtaining a just result and maintaining a sound body of precedent may sometimes override considerations of waiver." *Hicks*, 181 Ill. 2d at 544, 693 N.E.2d at 375. The principle of waiver "limits the parties' ability to raise an argu-

ment, not this court's right to entertain an argument." *People v. Heard*, 187 Ill. 2d 36, 60, 718 N.E.2d 58, 72 (1999). We choose to address the merits of the claim as we view this issue as one of first impression in Illinois and find analysis appropriate.

■ Defendants argue that the juror's oath is critical to the administration of justice.[1] One cannot disagree that the juror's oath is a solemn vow to serve the rule of law which governs the social contract of our society. The juror's oath is essentially a promise to lay aside one's "impression or opinion and render a verdict based on the evidence presented in court." *People v. Williams*, 40 Ill. 2d 522, 531-32, 240 N.E.2d 645, 651 (1968). The issue here is whether the failure to administer the juror's oath until the conclusion of the first day of testimony vitiates the entire proceeding and entitles defendants to a new trial.

The record reveals that defense counsel objected neither to the failure of the court to administer the juror's oath on the first day of trial nor to the belated administration of the oath on the second day of trial. Defendants do little more before us than identify this procedural irregularity and hope for a favorable ruling. They offer no argument and give this court no suggestion as to how they were prejudiced by the delayed swearing of the jury. This court cannot engage in speculation; thus, we turn to the record of proceedings for guidance.

Jurors are generally instructed and sworn to hear all the evidence without forming opinions as to guilt or innocence until the end of the trial. In the present case, the judge instructed the jury prior to hearing evidence:

> "Ladies and Gentlemen, I am going to talk with you for five minutes or so, and then we will excuse you for today, and we will pick up again tomorrow.
>
> * * *
>
> The hardest thing about being a juror is that you can't discuss the case with anyone, so I am ordering you not to discuss the case. That is in fairness to both sides. What you need to do is wait with an open mind until you hear all the evidence in the case, and then wait until I read to you what the law is and instruct you as to the law you are to apply to the case, and then, when you go back to the jury room, then and only then is it proper to begin to discuss the case, so do not discuss the case among each other, with each other when you are waiting in the morning or lunch, and don't discuss it at home with anyone else. When you go home, somebody will say, 'Were you picked,' and you will say, 'Yeah, I don't believe it.' They will say, 'What kind of case is it,' and you will say, 'I can't tell you.'

---

[1]The record does not contain the oath administered to the members of the jury because the oath was conducted off the record.

I don't want you to tell them what kind of case it is, and I don't want them to say anything about what they have saw [*sic*] or read. I want you to decide the case based on the evidence you will hear in this courtroom.

By the same token, for the same reason, I am ordering you not to watch the TV news tonight or listen to News Radio 78 or news radio programs or watch any TV, crime dramas, police dramas, or courtroom dramas. I don't expect that this case will be discussed, but I don't want any other external things to enter into your consciousness when you are focusing on this case. Again, I want you to decide the case on the evidence in the case, and that is the reason for the order regarding that.

\* \* \*

Ladies and Gentlemen, with that, if you would go back to the jury room, she will show you the jury room in the hallway. \* \* \* At the close of the case, I will instruct you that those of you who took notes may use your notes during deliberations. Those of you who do not take notes should not give undue weight to the recollection of a juror who did take notes just because they took notes. Your recollection of the evidence, even though you didn't take notes, may be just as good or reliable as a juror who did take notes.

So, with that, Folks, we will see you tomorrow at 10:15 A.M. Thank you."

■ The extensive nature of the judge's pretrial instructions to the jury and the fact that the jury in this case was sworn before it began deliberations obviate our concern that the proceeding was tainted. All the concepts required by our system of justice to be communicated to a juror were effectively imparted in these pretrial instructions. In this case, it is clear from the record that the pretrial instructions preserved the integrity of the proceeding until the juror's oath was administered. While swearing the jury is preferably done prior to opening statements (as all pretrial instructions may not be as thorough as those given in the instant case), the one-day delay in giving the oath did not deprive these defendants of a fair trial. We find no prejudice here and conclude that the delayed swearing of the jury was harmless.

We have found multiple cases from other jurisdictions in which courts have reached similar conclusions. In *United States v. Hopkins*, 458 F.2d 1353, 1354 (5th Cir. 1972), the court held that failing to administer the juror's oath until after the close of the government's case but before deliberation was harmless error where no prejudice was shown and no objection was made. In *State v. Block*, 170 Wis. 2d 676, 681, 489 N.W.2d 715, 717 (1992), the court held that, absent a showing of prejudice, reversal was not warranted because the jury was not sworn until six witnesses had testified for the State. In *Hollis v. People*, 630 P.2d 68, 70 (Colo. 1981), the court held that, absent an

objection or a showing of prejudice from defendant, it was harmless error not to swear the jury until after the first State's witness had testified. In *People v. Morales*, 168 A.D.2d 85, 88, 570 N.Y.S.2d 831, 833 (1991), the court held that because the jurors were sworn prior to deliberations and the defendant had failed to show any prejudice, the delay was harmless. In *State v. Roberge*, 155 Vt. 121, 582 A.2d 142, 143 (1990), the court held that, absent an objection or a showing of prejudice, there is no reversible error where a jury is sworn before deliberations in a criminal case. Further, we believe that it is incumbent upon the defense to raise an objection to an unsworn jury at trial or risk waiving the issue on appeal. See *Hicks*, 181 Ill. 2d at 544, 693 N.E.2d at 375.

### III. Prosecutorial Misconduct

■ Prosecutors are afforded wide latitude in closing argument and may argue reasonable inferences from the facts in evidence. *People v. Williams*, 192 Ill. 2d 548, 573, 736 N.E.2d 1001, 1015 (2000). This court will not reverse a trial court's determination concerning the propriety of a prosecutor's closing remarks absent an abuse of discretion. *People v. Hudson*, 157 Ill. 2d 401, 441, 626 N.E.2d 161, 178 (1993). Even if found to be improper, such remarks " 'generally do not constitute reversible error unless they result in substantial prejudice to the accused.' " *People v. Morgan*, 112 Ill. 2d 111, 132, 492 N.E.2d 1303, 1311 (1986), quoting *People v. Baptist*, 76 Ill. 2d 19, 29 (1979).

■ Courts have consistently held that prosecutorial remarks invited by defense counsel will not constitute reversible error absent a showing of substantial prejudice. *People v. Mendez*, 318 Ill. App. 3d 1145, 1152, 745 N.E.2d 93, 100 (2001). We also note that even prejudicial statements by the prosecutor may be cured by the court's proper instructions of law. *People v. Simms*, 192 Ill. 2d 348, 396, 736 N.E.2d 1092, 1124 (2000). "[T]he act of promptly sustaining the objection and instructing the jury to disregard such argument has usually been viewed as sufficient to cure any prejudice." *People v. Gonzalez*, 142 Ill. 2d 481, 493, 568 N.E.2d 864, 869 (1991). However, "the prejudicial effect of an improper argument cannot always be erased from the minds of the jurors by an admonishment from the court." *People v. Baptist*, 76 Ill. 2d 19, 30, 389 N.E.2d 1200, 1205-06 (1979).

■ While a prosecutor may comment on the persuasiveness of the defense theory of the case as well as any supporting evidence and reasonable inferences drawn therefrom, "[i]t is blatantly improper to suggest that the defense is fabricated, as such accusations serve no purpose other than to prejudice the jury." *People v. Aguirre*, 291 Ill. App. 3d 1028, 1035, 684 N.E.2d 1372, 1377 (1997). While a prosecutor

may comment on defense "counsel's failure to produce evidence promised in opening statement so long as the comments do not reflect upon defendant's failure to testify" (*People v. Huddleston*, 176 Ill. App. 3d 18, 30, 530 N.E.2d 1015, 1023 (1988)), "[a]ccusations of deception and trickery by defense counsel serve no purpose except to prejudice the jury." *People v. Thompson*, 313 Ill. App. 3d 510, 514, 730 N.E.2d 118, 122 (2000). "Comments disparaging the integrity of defense counsel and implying that the defense presented was fabricated at the direction of counsel have consistently been condemned. [Citations.]" *People v. Starks*, 116 Ill. App. 3d 384, 394, 451 N.E.2d 1298, 1305 (1983).

Our supreme court has held that it is improper for a prosecutor to accuse a defendant's attorney of "lying and *** attempting to create a reasonable doubt by 'confusion, indecision, and misrepresentation.' " *People v. Weathers*, 62 Ill. 2d 114, 120, 338 N.E.2d 880, 883 (1975). More recently, our supreme court stated that " '*[u]nless based on some evidence,* statements made in closing arguments by the prosecution which suggest that defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury are improper. [Citations.]' " (Emphasis in original.) *People v. Kirchner*, 194 Ill. 2d 502, 549, 743 N.E.2d 94, 119 (2000), quoting *People v. Jackson*, 182 Ill. 2d 30, 81, 695 N.E.2d 391, 416 (1998). "Moreover, '[w]here a prosecutor's statements in summation are not relevant to the defendant's guilt or innocence and can only serve to inflame the jury, the statements constitute error.' [Citations.]" *People v. Kidd*, 147 Ill. 2d 510, 542, 591 N.E.2d 431, 446 (1992).

■ The burden of proof in a criminal trial "includes both the burden of producing evidence and the burden of persuading the trier of fact." *People v. Ziltz*, 98 Ill. 2d 38, 43, 455 N.E.2d 70, 72 (1983). As the burden of proving defendants' guilt beyond a reasonable doubt always rests on the prosecution, defendants are not obliged to offer any proof of innocence. *People v. Armstead*, 322 Ill. App. 3d 1, 15, 748 N.E.2d 691, 703 (2001), citing *People v. Weinstein*, 35 Ill. 2d 467, 470, 220 N.E.2d 432, 434 (1966), and *People v. Swift*, 319 Ill. 359, 365-66, 150 N.E. 236, 266 (1925); *People v. Millighan*, 265 Ill. App. 3d 967, 971, 638 N.E.2d 1150, 1154 (1994); *People v. Berry*, 264 Ill. App. 3d 773, 780, 642 N.E.2d 1307, 1314 (1994); see also *People v. Coulson*, 13 Ill. 2d 290, 296, 149 N.E.2d 96, 99 (1958) (holding that a conviction "must rest on the strength of the People's case and not on the weakness of the defendant's case"). While defendants are not required to present any evidence of innocence, defendants may, however, posit alternative theories to explain the evidence presented by the prosecution.

In the instant case, after the prosecution concluded its case in chief, defense counsel opted not to present a defense case. Closing arguments commenced with the prosecution's customary recitation of the evidence presented at trial and reasonable inferences drawn from the evidence.

During closing arguments, the defense presented two hypotheses intended to engender reasonable doubt in the minds of the jurors. The first hypothesis suggested that the driver of the Taurus saw something on the dirt road and that this prompted him to drive back to the road entrance. Defense counsel stated:

> "No one can say for sure that there was—beyond a reasonable doubt, I should say, that there wasn't another car down there where the body [Luis Acre's body] was found."

This hypothesis was further developed by counsel stating:

> "Whether they saw a person down there, whether they saw headlights, another car down there, the State hasn't proven it. Certainly you know and you've heard that there's another way in and out. The road continues on and keeps going through the marsh or whatever is back there."

The other hypothesis posited by defense counsel suggested that because Gabrielle Gonzales was badly wounded and approached Terry from the west side of the train, Gonzalez could not have been the man seen running across the tracks from defendants to the east side of the train. Counsel argued that the man seen sprinting was some other individual who then disappeared into the marsh east of the train.

In the State's rebuttal, the prosecutor, Mr. Fabio Valentini, lambasted defense counsel utilizing what the State characterized as continuous examples of defense attorney misconduct. Defendants characterize the prosecutor's comments in his rebuttal as accusations of "defense fabrication," "witness mistreatment" and "witness intimidation." Defendants point out the 30-plus objections the defense was forced to make during rebuttal alone.

The State counters that the prosecutor's comments were properly based on the evidence, that the trial court did not abuse its discretion when it overruled objections to allegations of witness mistreatment and that the alleged witness intimidation was not reversible error.

█ We first note that the State misstates the law by claiming that Arias waived all questions of prosecutorial misconduct because his counsel failed to object at trial. While this court notes that the waiver argument is a workhorse of the State's Attorney's office and often is dispositive, waiver cannot be ubiquitously applied when the record does not support such a finding. In order to preserve an issue for appeal, a defendant must make a contemporaneous objection at trial and

raise the issue in a posttrial motion. *People v. Nieves*, 193 Ill. 2d 513, 524, 739 N.E.2d 1277, 1282 (2000). "However, this rule is not absolute. A reviewing court may consider errors which affect substantial rights (73 Ill. 2d R. 615(a)), or which *** are sufficiently prejudicial to deny defendant a fair trial." *People v. Whitlow*, 89 Ill. 2d 322, 342, 433 N.E.2d 629, 638 (1982).

The record reveals that the only issue to which defendant Arias' counsel did not object was the alleged witness intimidation; however, Abadia did preserve the issue on appeal. As we must consider the prejudicial impact of the comment as to Abadia, we cannot escape the fact that defendants were tried jointly and "legal responsibility" instructions were given to the jury.

We consider the present case analogous to *Whitlow* where "[t]he defendants were tried jointly on both conspiracy and substantive charges, and an 'accountability' instruction was tendered to the jury." *Whitlow*, 89 Ill. 2d at 342, 433 N.E.2d at 638. Our supreme court stated that because "the State's theory involved the responsibility of each defendant for the acts of his codefendants," "improper remarks directed at one defendant were likely to be considered by the jury as evidence against all of them." *Whitlow*, 89 Ill. 2d at 342, 433 N.E.2d at 638. Just as the supreme court considered the cumulative impact of all prejudicial comments on all defendants in *Whitlow* (89 Ill. 2d at 342, 433 N.E.2d at 638), we will consider the witness intimidation comment in weighing the cumulative prejudicial effect of the other rebuttal comments on both Abadia and Arias.

Having disposed of the waiver issue, we turn to the defendants' contention of prosecutorial misconduct. Defendants claim the prosecutor made accusations of fabricating defenses and witness mistreatment during rebuttal argument.

The prosecutor stated:

"The problem is it takes four years for a case like this to go to trial. *** During the four years, from June 20, 1995 and apparently this morning, it gets four years for two teams of defense lawyers to come up with and concoct the various theories and ideas of what might have happened and what they wished the evidence would show. *** And the night before closing arguments, apparently they sit around and fantasize and concoct a whole bunch of theories [*sic*] impossibilities of what could have happened and what may have happened and what probably happened.

\* \* \*

You should ask yourself why lawyers for these defendants would stand here and make up stories.

\* \* \*

Why in three days they would present distractions and continue to present distractions and distort things and misstatements and confuse things and change theory during the course of the trial.

\* \* \*

As I was saying, you have to ask yourself why the defense in this case keeps changing.

\* \* \*

Robert Terry is a hard working guy who didn't deserve the abuse he endured. The abuse he endured on the stand when he was mocked and mistreated and things were misstated to him and things were suggested to him when he had said that he said he didn't say.

\* \* \*

And at one point Mr. Meczyk said he questioned him about something he said on direct examination and he said sir, I took notes, I took notes and he was going to cross-examine him and suggest that he was saying something different, but he couldn't prove it up.

\* \* \*

You know, we happily accepted the burden in this case as we do in every case. But when things are misstated, when things are misstated to you, you should ask yourself why.

\* \* \*

Why are you being told things that are completely not true?

\* \* \*

And despite what people want to tell you, despite their misstatements, despite all the baloney, you remember Robert Terry's testimony.

\* \* \*

What trial are they talking about? Not this one.

\* \* \*

Why do they keep changing?

\* \* \*

Why are they misstating the evidence and making things up as they go along?

\* \* \*

Don't let them confuse you.

\* \* \*

Not only that, doesn't that deny common sense? Isn't that ridiculous? Isn't that a desperate argument made by desperate defendants who are clearly, clearly in a desperate situation now?

\* \* \*

\*\*\* [I]t defies common sense and it's an insult to your intelligence.

\* \* \*

That is a complete misstatement of the evidence.

\* \* \*

Don't let them confuse you by misstating the evidence.

\* \* \*

\*\*\* [I]t's another method to try and get you to think about something other than the evidence in this case.

\* \* \*

And it is about seeing justice done, and justice doesn't mean you execute someone and scare off all the witnesses and you get away with it.

\* \* \*

They mocked him when they testified about his military experience. They misstated things he said, they misquoted him, they made fun of him.

\* \* \*

But you can understand why they don't like Robert Terry.

\* \* \*

You can understand why they want you to believe things he said that he didn't say. You can understand why they will misquote him and they will mock him."

■ We must turn to the record to examine the prosecutor's comments in the context of the entire arguments of both the defense and the prosecution. *People v. Morgan*, 142 Ill. 2d 410, 453, 568 N.E.2d 755, 770 (1991). As the defense chose not to present a case, the record contains only the prosecution's case in chief. Consequently, the record does not contain evidence that could support the hypotheses that the defense argued in closing. The record also contains no evidence that would clearly contradict the defense hypotheses. Lacking such evidence in the record, we cannot ascertain the truth or falsity of the defendants' closing arguments from the record. We are therefore certain that if we cannot detect any evidence of defense fabrication, the prosecution had no evidence that the defense was concocted. Unless predicated on evidence that defense counsel behaved unethically, the accusations that defense counsel attempted to create a reasonable doubt by confusion, misrepresentation, deception, and fabrication were irrelevant to the defendants' guilt or innocence, improper and highly prejudicial. *Weathers*, 62 Ill. 2d at 120, 338 N.E.2d at 883; *Kidd*, 147 Ill. 2d at 542, 591 N.E.2d at 446; *People v. Fluker*, 318 Ill. App. 3d 193, 202, 742 N.E.2d 799, 806 (2000).

After a careful review of the record, we cannot characterize the

prosecutor's rebuttal argument either as based on the evidence or as invited comment by the defense. *Mendez*, 318 Ill. App. 3d at 1152, 745 N.E.2d at 100; *Kirchner*, 194 Ill. 2d at 549, 743 N.E.2d at 119. Furthermore, we do not believe the court's instructions of law could cure the substantial prejudice caused by the prosecutor's comments. *Simms*, 192 Ill. 2d at 396, 736 N.E.2d at 1124. "Where there are numerous instances of improper prosecutorial remarks, a reviewing court may consider their cumulative impact, rather than assessing them in isolation." *People v. Brown*, 113 Ill. App. 3d 625, 630, 447 N.E.2d 1011, 1015 (1983), citing *Whitlow*, 89 Ill. 2d at 341, 433 N.E.2d at 638. The prosecution's rebuttal strayed so often from proper lines of argument that its cumulative effect was to deprive the defendants of a fair trial by drawing the jury's attention away from the issues in the case. *Fluker*, 318 Ill. App. 3d at 202, 742 N.E.2d at 806; see *People v. Blue*, 189 Ill. 2d 99, 140, 724 N.E.2d 920, 941 (2000) (holding that reversal was warranted when "the trial court allowed the guilty verdict to rest on considerations other than the evidence alone"). The prosecutor's comments attacking both defense counsel served no purpose but to prejudice the trier of fact against the defense and thus constitute reversible error.

Defendants also argue that the prosecutor prejudiced the jury against defendants during closing argument by accusing defense counsel of mistreating the State's star eyewitness. Specifically, the prosecution stated that the train engineer, Robert Terry, was "abused," "mocked and mistreated" and that "things were misstated to him and things were suggested to him when he had said that he said he didn't say." We acknowledge defense counsel's intellectual agility in deciphering the prosecution's complex sentence and making a timely objection. However, we ourselves must once again turn to the record in resolving this issue.

Examining the record in light of the prosecutor's comment, we can ascertain only two instances in which the defense could have "suggested" a response to Terry. During cross-examination, defense counsel asked Terry whether he had told two police officers he had seen a car drive south on Yates Avenue 15 minutes before he heard gunshots and saw a man running toward his train, as reflected in a police report. Terry testified that he did not tell the police 15 minutes had lapsed between seeing the car and hearing the gunshots. The police report was not entered into evidence. Questioning Terry on the timeline of events was a legitimate area of inquiry and certainly not "abuse." The only other such instance was when defense counsel cross-examined Terry about whether he saw Gonzales turn to fire a gun at the defendants while running. Terry stated on both cross-

examination and redirect that he told police that he thought the man running away from defendants had fired a gun at defendants. Terry then clarified his testimony by stating that he neither saw a gun in Gonzales' hands nor saw a muzzle flash.

Given the record, we fail to understand how the defense "abused" the witness in asking questions about potential inconsistencies in the witness' testimony. We conclude that the prosecutor mischaracterized the cross-examination of the State's eyewitness in his rebuttal. The State's mischaracterization was not relevant to the guilt or innocence of defendants and could only serve to inflame the jury. *People v. Smith*, 141 Ill. 2d 40, 60, 565 N.E.2d 900, 908 (1990). As such, the prosecutor's false allegation of witness "abuse" constitutes further error. *Kidd*, 147 Ill. 2d at 542, 591 N.E.2d at 446;

The final instance of misconduct occurred when the prosecutor stated "justice doesn't mean you execute someone and scare off all the witnesses and you get away with it." Defense counsel's objection was sustained and the jury was instructed to disregard the remark. " 'Prosecutorial comments which suggest that witnesses were afraid to testify because defendant had threatened or intimidated them, when not based upon any evidence in the record *** are highly prejudicial and inflammatory.' " *People v. Mullen*, 141 Ill. 2d 394, 405, 566 N.E.2d 222, 228 (1990), quoting *People v. Ray*, 126 Ill. App. 3d 656, 662 (1984). Searching the record, we have failed to identify any evidence which would support the prosecution's accusation of witness intimidation and further find the harm to defendants could not be cured by the trial court's sustainment of the objection and subsequent curative instruction. *People v. Brown*, 113 Ill. App. 3d 625, 629, 447 N.E.2d 1011, 1014 (1983). This outrageous accusation of witness intimidation yet serves to more throughly convince us that the prosecution's rebuttal commentary constituted a pattern of conduct designed to inflame and arouse the prejudice of the jury. *Brown*, 113 Ill. App. 3d at 629, 447 N.E.2d at 1014. Such conduct by the prosecution constitutes reversible error. *Mullen*, 141 Ill. 2d at 405, 566 N.E.2d at 228; *Kidd*, 147 Ill. 2d at 542, 591 N.E.2d at 466.

As our finding of prosecutorial misconduct requires us to reverse the defendants' convictions, we need not address the remaining two issues on appeal.

## CONCLUSION

We hold that although there was sufficient evidence to convict the defendants and the unsworn jury had no prejudicial effect, the prosecutor's comments during rebuttal argument caused such substantial prejudice to defendants that our confidence in the verdict

has eroded to the point where we cannot confidently state that the trial was fundamentally fair. We therefore reverse defendants convictions and remand the case to the circuit court for a new trial.

Reversed and remanded for new trial.

TULLY, J., concurs.

JUSTICE COUSINS, specially concurring:

Because I agree that comments made by the prosecutor during rebuttal argument caused substantial prejudice to the defendants, I concur specially in the decision to reverse and remand for a new trial. However, the opening statement that was made by the defense counsel for Abadia in this case is a "bombshell." The defense counsel made the following opening statement:

> "At the very outset I want to tell you that the charge against Roberto Abadia is a false charge, it's an absolutely false charge.
>
> * * *
>
> Members of the jury, it's true that Roberto Abadia has those legal advantages, the burden of proof and the presumption of innocence. But in this case Mr. Abadia doesn't want it.
>
> Mr. Abadia is going to prove to you, we will competently prove to you, that he did not commit any murder.
>
> Members of the jury, I'm going to bring into this courtroom—Let me back up. Let me tell you this:
>
> I'm going to make full disclosure to you about Roberto Abadia and I'm going to tell you at the very outset, at the very beginning of this trial that Mr. Abadia is not an angel and that he's not a choir boy. I want to tell you that from the beginning.
>
> Mr. a Babb [sic] I can't was, in fact, involved with illegal substances, with controlled substances. Yes, he was a drug dealer and yes, members of the jury, I'm going to prove to you that he owed people money and so did the dead person in this case, the decedent, Mr. Arce. And but for the grace of God Roberto Abadia was almost a victim himself. And there is another eyewitness to this case, members of the jury, besides the engineer of that Norfolk and Western locomotive facing south down those tracks, and there is another eyewitness in this case, and you are going to hear from that eyewitness as to what really happened down that embankment that ran parallel down to those railroad tracks. And you're going to hear that Mr. Abadia himself was going to be a victim of an execution. And you're going to hear what actually occurred that night and what happened to him.
>
> You're going to hear things in this case that the prosecution has

in their file and won't disclose, but we will disclose those to you and we'll bring the light of day into this courtroom and not hide anything from you.

You are going to hear evidence, and when you—evidence that will exonerate, if you will, that at the end you will come to the conclusion that Roberto Abadia is not a murderer.

\* \* \*

Counsel mentioned to you the gunshot residue. Yes, and he also mentioned to you blood on Mr. Abadia. I can tell you that there was indeed blood on Mr. Abadia. And you'll find out the reason soon enough why there was blood on Mr. Abadia.

\* \* \*

Members of the jury, when this case is over you will come to the conclusion that Mr. Abadia is not a murderer and this is a false charge. And our evidence, that is Mr. Abadia's evidence, will come in."

During the closing argument, counsel for defendant Abadia argued:

"There is an instruction that the Judge is going to give to you this morning.

\* \* \*

I suppose that saves me because two days ago I came to this courtroom and I promised every one of you folks sincerely that I was going to present the case.

I'm not asking his Honor, Judge Moran to exonerate me or save me or what this instruction the law, the law of the State of Illinois to save me.

If you're mad at me, please don't take it out on Roberto Abadia, tell me afterwards, 'you lied to me.' I didn't lie to you. I sincerely thought I had to present a case."

In my view, this is a case where the arguments by both the State and defense are improper. Unfortunately, when such occurs, justice is thwarted.