2018 IL App (1st) 143899

No. 1-14-3899

April 10, 2018

SECOND DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | Of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | No. 13 CR 10314 |
| v. | ) | |
| | ) | The Honorable |
| JESUS SANCHEZ, | ) | Thomas P. Fecarotta, Jr., |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

PRESIDING JUSTICE NEVILLE delivered the judgment of the court, with opinion.
Justices Pucinski and Mason concurred in the judgment and opinion.

**OPINION**

¶ 1     A jury found Jesus Sanchez guilty of a murder committed in 2013, when Sanchez was 18 years old. The trial court sentenced him to 45 years in the penitentiary. On appeal, Sanchez contends that the evidence does not prove that he committed the offense and that the trial court should have suppressed the statements he made. We hold that the evidence shows that he did not voluntarily make the statements the prosecution relied on for the conviction, and therefore, the trial court should have suppressed them. Even with the statements in evidence, the prosecution did not present sufficient evidence to prove Sanchez guilty. All of the

physical evidence and eyewitness testimony showed that the shots came from a different place and at a different time than the shooting described in Sanchez's confession, and no physical evidence or eyewitness testimony connected Sanchez to the shooting. Accordingly, we reverse the conviction.

¶ 2                                                BACKGROUND

¶ 3        We include a map at the end of this opinion to help clarify the testimony. The map is a photograph of an exhibit the prosecution introduced into evidence. The scale shown on the map applies to the full-sized exhibit, which is about 3 feet by 4 feet.

¶ 4        Around 8 p.m. on May 1, 2013, near a Wheeling, Illinois, neighborhood called Winetree, Miguel Cortes stood on Bridle Trail, talking with Sanchez, Bryan Estrada, Heladio Flores, and Scarleth Rodriguez. Rodriguez got a call from Danielle Pettibone, who invited her to visit. Miguel escorted Rodriguez to Pettibone's home in the building numbered 490 in Winetree. As Miguel and Rodriguez walked away, Collin Scheffler drove up to the group in a white car with two passengers, Leslie and Brett.

¶ 5        Miguel left Rodriguez at Pettibone's home and went to rejoin the group on Bridle Trail. On the way, Miguel, a member of the Maniac Latin Disciples, encountered several members of the Sureños, a rival street gang that operates in Wheeling. Rafael Orozco, Edson Calleros, and Miguel's father, Martin Cortes, joined the group, who stood near a streetlamp between building 486 and 492, south of Pleasant Run Drive and north of Equestrian Drive. Four gunshots rang out. Orozco said he had been hit. Martin held Orozco while Miguel tried to stop the bleeding.

¶ 6         An ambulance carried Orozco away a few minutes later, after police arrived. Sergeant Michael Conway activated his dashboard camera as he approached the area. The initial report indicated that a drive-by shooting from Equestrian Drive had occurred. About 30 minutes after Conway arrived, he saw Sanchez and Estrada running toward him, chased by several members of the Sureños gang. Conway handcuffed Sanchez and Estrada and ordered them to sit on the curb. Detective Ignacio Oropeza came to the scene and saw one of the Sureños, who said that Sanchez knew something about the shooting. After leaving Sanchez and Estrada handcuffed on the curb for more than 30 minutes, Conway placed them in separate cars, still handcuffed, for transport to the police station.

¶ 7         Detective Michael Bieschke also went to the scene of the shooting. He found Flores, then 15 years old, hiding in bushes in the backyard of 1009 Pear Tree Lane. Police brought Flores to an interview room in the police station, where Bieschke questioned him.

¶ 8         An officer took Sanchez's cell phone, and Oropeza placed Sanchez in an interview room and spoke with him briefly at 10:30 p.m. An officer swabbed Sanchez's hands around 11 p.m. and sent the swabs to the police lab to test them for gunshot residue (GSR). The same officer later collected Sanchez's clothes and sent them to the lab for the same test.

¶ 9         Orozco died that night from a single gunshot wound to the back.

¶ 10         Oropeza returned to question Sanchez further around 3:00 a.m. on May 2, 2013. Sanchez answered questions about a fight involving Calleros that occurred around 3:30 p.m. the day before. Oropeza swabbed Sanchez's hands again at 3:42 a.m. and ran a test he referred to as a "presumptive GSR test." The test produced a positive result.

¶ 11    Before 7 a.m. on May 2, 2013, Oropeza turned on a video recording device in the room where Sanchez sat. Oropeza read Sanchez his *Miranda* rights around 7:30 a.m. and brought in Detective Bush to question Sanchez further. Sanchez elaborated somewhat on the account he gave to Oropeza. When the detectives confronted Sanchez with the positive result of the "presumptive GSR test," Sanchez asserted repeatedly that he had not seen or shot a gun that evening.

¶ 12    The detectives told Sanchez that his story was "bullshit," and repeatedly, falsely asserted that several witnesses had said they saw Sanchez carrying a gun that evening. The detectives said the "tests don't lie" and suggested that Sanchez was "scared [he was] going to get shot." The detectives suggested that Sanchez should blame Estrada for the shooting. Sanchez began crying and said repeatedly, "I didn't do anything." Bush moved the table out from between them, came right next to Sanchez, and further emphasized that he would not believe Sanchez's account. Bush said, "This was an accident. You didn't mean for this to happen, did you?" Again, Sanchez said, "I didn't do anything, sir." Bush answered, "[W]e're over that. There's too many people that saw you." This statement was, again, false. Again, Sanchez said, "I didn't do anything."

¶ 13    About 10 hours after police brought Sanchez to the station, he changed his account. Bush asked, "Did Brian do something? *** What did Brian do? You're almost there." Sanchez answered, "He's the one that shot." Bush asked where Estrada stood when he shot the gun. Sanchez said, "[t]he farthest parking lot." Bush suggested that Estrada stood on Equestrian Drive or by the tennis courts. Sanchez pointed to a spot on the map police showed him. Bush accused Sanchez of lying, and said, "Everybody's telling me that you had the gun." Sanchez

4

said, "I didn't have anything, sir. I put it on my mom's life right now, 'cause she's so sick right now, that I didn't have any gun, sir."

¶ 14    Bush suggested again, "this was just self-defense?" Sanchez said, "I didn't shoot nobody," "I didn't have any gun," and "I want to see my mom." Bush said, "I can let you see your mom after we talk about this and get the truth." Again Sanchez said, "I did not do anything." Bush again accused Sanchez of lying. Bush said, "it was an accident. Is that correct?" Sanchez responded, "Sir, I want to see my mom." Bush limited Sanchez's choices: "I need to hear it from you, then, if it was an accident or did you intend to hit him?" Sanchez said, "I don't have a gun." Bush persisted: "[E]verybody's telling me it was you and plus the GSR, you gotta understand it, okay?" Sanchez said, "Sir, if it was me, sir, I take the blame," "I would say it," and "I'm telling you the truth."

¶ 15    Bush returned to the tactic of getting Sanchez to blame Estrada. Sanchez eventually said, "I held it, but Brian shot it." Through tears he said, "I want to get out of here. My mom is worried about me." Sanchez explained in his new story that Estrada showed him the gun and he held it briefly, then Estrada took it back and ran off to shoot. Sanchez said his mother "just had surgery a day ago," and "[s]he doesn't know right now. She's worried about me." Bush accused Sanchez of lying and said, "These tests only happen when you fire a weapon." Sanchez still said, "I didn't fire no weapon"; "It was Brian. I didn't fire anything, sir." Bush said, "Jesus. Unfortunately, we already know that you did." Bush encouraged Sanchez to tell his side of the story. Sanchez said, "I give you my side, sir, you still won't believe me."

¶ 16    A few minutes later, Sanchez tried another revised account. He said, "It went off by itself," and then Estrada took it from him. Bush asked, "Is it a revolver or a semi-automatic?"

5

Sanchez said, "It was a revolver," and "I want to go home to my mom." Sanchez attempted to complete the story. He pointed on the map to where he said the gun discharged. He found a spot between the buildings numbered 540 and 544, close to 100 yards north of where Orozco stood when the bullet hit him. He explained that Estrada wanted to shoot, because "he thought they had shot Miguel." Estrada had the gun, and when he handed it to Sanchez, "it went off." Sanchez said he "ran to the cops" because Sureños "told [him he] was a dead man."

¶ 17     Oropeza asked Sanchez to retell the evening's events. Sanchez said that Miguel joined Sanchez, Estrada, Flores, and Rodriguez on Bridle Trail. Rodriguez got a call, and Miguel left with Rodriguez just before Scheffler, with Brett and Leslie, stopped by in Scheffler's white car. Sanchez, Estrada, and Flores got into Scheffler's car, and Estrada showed Sanchez Estrada's gun, a black revolver. Estrada said he "was gonna get those guys back." Estrada hopped out of the car, and Sanchez ran with him. Sanchez showed on the map that they got out of Scheffler's car by the 410 building. After the gun accidentally discharged, he and Estrada ran in different directions, Estrada carrying the gun. When the Sureños chased them, they met again just before running up to Sergeant Conway.

¶ 18     Oropeza sought to clarify the route Estrada and Sanchez took when they left Scheffler's car:

> "DETECTIVE OROPEZA: —why did you guys walk around this way? Why?
>
> MR. SANCHEZ: Brian didn't want to go through cops.
>
> ***
>
> *** I was just trying to go to my car. I was just trying to go home."

¶ 19     Earlier that day, Sanchez had parked his car in a lot on the west side of the 492 building. Police found the car there after they arrested Sanchez. Bush said, "Listen, you did good. I'm glad you were honest with us." Sanchez immediately asked to see his mother. Bush said the police needed to "clarify some things" first. Sanchez pleaded, "Let me talk to her"; "I want to talk to my mom." Oropeza said, "You will talk to your mom, okay? All right? Just not right now, okay?"

¶ 20     An hour later, Bush asked for a repetition of the confession. Sanchez said Scheffler drove from Bridle Trail to Longacre Lane to Equestrian Drive to Illinois Route 83 to Palatine Road. Scheffler stopped on Palatine Road, and Estrada said he wanted to shoot Sureños because he felt disrespected in the fight that took place around 3:30 p.m. on May 1. Scheffler drove them on Palatine Road to Wheeling Road and then to the parking lot by the 410 building. Sanchez marked on the map where he, Estrada, and Flores stood when the gun went off, when they were between the buildings numbered 540 and 544, north of the 486 and 492 buildings near where Orozco was shot. Sanchez said that when Estrada looked ready to shoot, Sanchez tried to take the gun away from him, and it went off in his hand. After the four shots discharged, Estrada took the gun and ran west toward the park.

¶ 21     Bush asked for a further description of the gun, but Sanchez said only it was black with a black handle, and Sanchez did not know the caliber. Bush asked, "[W]as it hard to pull the trigger?" Sanchez answered, "Yeah, it was." At the conclusion of the questioning, Sanchez again said, "I just want to talk to my mom." The detectives again told Sanchez to wait.

¶ 22     More than an hour and a half later, Sanchez knocked on the door of the interview room. He asked, "Can I talk to my mom yet?" Oropeza said, "not right now." Sanchez asked,

"When can I talk to my mom?" and Oropeza said, "when *** we get to it." Five minutes later, Sanchez knocked again and asked again, saying, "She doesn't know where I am," and "Please let me talk to her." Bush told him to wait. Five minutes later Sanchez asked again. Oropeza said, "I got food coming for you." Sanchez answered, "I don't want any food," "I want to talk to my mom." Again the response was "Not right now." When Oropeza brought food a few minutes later, Sanchez repeated his plea, to the same effect. After five minutes, Sanchez knocked again and asked to talk to his mother, "[j]ust a quick call." Oropeza said, "No, that cannot be done."

¶ 23    Sanchez waited almost 10 minutes before knocking again, with the same result. Then 30 minutes later, a different officer said he could call his mother "in a little bit." Twenty minutes later, another knock, another request, and another denial. Fifteen minutes later, another knock, and Oropeza said, "what was the answer to your question?" Sanchez said only, "Officer, please."

¶ 24    Police came in of their own accord 15 minutes later, at 2 p.m. on May 2 and searched Sanchez for tattoos. They took Sanchez out of the interview room, listening to Sanchez repeat his plea to call his mother. They denied the request.

¶ 25    Bush and Oropeza questioned Sanchez anew at 5 p.m. on May 3, 2013. Sanchez told the detectives that he had lied on May 2, that he and the others in the car never fired a gun. A member of the Spanish Gangster Disciples he knew only as "Bone Crusher" had threatened Sanchez and Leslie. Sanchez asked if the others in the car had all confirmed his initial account, that they had been on Bridle Trail when they heard the shots, then they left the area and returned to the parking lot by building 410, and then "Leslie got out of the car to see who

got shot." Bush said, "This was the made-up story that you guys had fuckin' already talked about." Regarding Bone Crusher, Bush said, "[Y]ou and Leslie are trying to fabricate stuff."

¶ 26    Bieschke's initial questioning of Flores, like Oropeza's initial questioning of Sanchez, went unrecorded. Flores initially gave an account that closely matched Sanchez's initial account. Flores said he and Sanchez were with friends on Bridle Trail when they heard four gunshots. They got into Scheffler's car, and they left the area but returned to find out whether Miguel had been shot. Scheffler parked by building 410. Leslie got out to find out about the shooting. Nothing Flores said implicated Sanchez in the shooting.

¶ 27    Bieschke turned on the video recorder around 10 a.m. on May 2, 2013, after Bush and Oropeza had obtained incriminating statements from Sanchez. He brought in a second detective to question Flores. Flores again said the group on Bridle Trail heard the gunshots and got into Scheffler's car. The detectives said they knew what had happened, and asked whether Flores wanted to be held accountable. They asked Flores what he thought Estrada had said. Flores repeated that he heard four shots, and he did not know where they came from. The police told Flores to stop lying. They then falsely told Flores that Sanchez and Estrada said Flores shot Orozco. Flores still said he did not know who fired the gun. The detectives told Flores, falsely, that Sanchez tested positive for gunshot residue. Flores, using a map like the one Sanchez used, traced the path from Scheffler's car, parked by building 410, and showed where he went a different direction from Estrada and Sanchez. He said Sanchez held a silver gun with a brown handle.

¶ 28    The detectives suggested that Calleros was a "pancake" because he flipped from the Maniac Latin Disciples, the gang to which Flores belonged, to the Spanish Gangster

9

Disciples. They asked if someone said, "we've got to kill the pancake." Flores said, "Yeah." The detectives suggested that after the shooting, Sanchez threw the gun in the pond. Flores said, "Yeah." Flores marked the map to show where he saw Sanchez right before the shooting. He picked a location between buildings 540 and 544, the same point where he separated from Estrada and Sanchez when the Sureños started chasing them about 20 minutes after the shooting.

¶ 29    Police searched the pond for three days. They found no gun. They found no shell casings by the murder scene. An officer found one spent bullet, and a satellite dish apparently nicked by a bullet, near the spot where a bullet hit Orozco. The officer concluded that the bullet had come from south of where Orozco stood. The bullet that killed Orozco entered his back as he faced north, so it must have come from south of Orozco. Police never found the other bullets the killer fired. Although police found no corroboration for the statements from Sanchez and Flores, and strong physical evidence showed that the bullet could not have come from the spot where both Flores and Sanchez said Sanchez stood when the gun discharged, the State decided to charge Sanchez with the murder of Orozco and the attempted murder of Calleros.

¶ 30                                    Pretrial Proceedings

¶ 31    Sanchez filed a motion to suppress the statements he made to Bush and Oropeza on three grounds: (i) Sanchez did not make the statements voluntarily, (ii) police failed to read Sanchez his *Miranda* rights prior to custodial questioning, and (iii) police violated statutory law requiring video recording of custodial questioning that forms part of a murder investigation. See 725 ILCS 5/103-2.1(b) (West 2012).

¶ 32    At the hearing on the motion to suppress, Conway testified that when he arrived at the scene

> "It was very chaotic. [He saw] fifteen to twenty people in the courtyard yelling at the police get the fuck out of here. We need an ambulance. What took you guys so long. Why are you here?"

He saw Sanchez and Estrada running toward him about 30 minutes after he came to the scene. Conway recognized Estrada, but he had never seen Sanchez before. He told Sanchez and Estrada to sit on the curb, and he handcuffed them, but he told them they were not under arrest.

¶ 33    Oropeza testified that after Sanchez arrived at the police station, Oropeza told Sanchez to wait in the interview room and that he wanted to speak to Sanchez about the shooting. Oropeza admitted that he did not tell Sanchez he was free to leave. Oropeza ordered the GSR tests of Sanchez's hands and clothing. Oropeza chose not to record the interviews with Sanchez at 10:30 p.m. on May 1 and at 3:00 a.m. on May 2. Oropeza admitted that he first advised Sanchez of his *Miranda* rights at 7:30 a.m. on May 2, 2013.

¶ 34    Judge Thomas Fecarotta ruled that police did not arrest Sanchez until 4 a.m. on May 2, when the "presumptive GSR" test returned a positive result. The questioning before that time did not qualify as custodial, and police had no need to warn Sanchez of his *Miranda* rights. The judge found that Sanchez voluntarily confessed to firing the gun. Therefore, the judge denied the motion to suppress.

¶ 35    Shortly before the date set for trial, the parties learned that a drug rehabilitation center had treated Flores as an inpatient. Although the judge granted defense counsel's request for

11

an order directing the rehabilitation center to produce Flores's medical records, the judge denied defense counsel's request for a continuance, and the request to bar Flores, when the rehabilitation center failed to produce the records prior to trial.

¶ 36        Sanchez's attorney, Julie Koehler, filed a motion *in limine*. In paragraph 2 of the motion, she asked the judge to bar "[a]ny video or in court testimony regarding Defendant Sanchez and Bryan Estrada being chased by rival gang members through the Wine Tree Apartment Complex prior to his being placed in custody." The judge ruled, "So I'm going to grant the motion *in limine* as to Paragraph 2 with the caveat if there is an indication to the jury through questioning that this did not happen, then the State is going to be allowed to show the video. So Paragraph 2 based on that ruling will be granted." The judge also granted defense counsel's motion to bar reference to the "presumptive GSR test."

¶ 37                                            Trial

¶ 38        Elena Calleros testified that on May 1, 2013, her son Edson came running home from school around 3:30 p.m. chased by Sanchez and another young male. One of the chasers struck Elena when Elena blocked them from hitting Edson. Sanchez and the other young man ran off when she threatened to call police.

¶ 39        Miguel testified that in 2013, he, Flores, Estrada, and Sanchez all belonged to the Maniac Latin Disciples street gang. On May 1, 2013, around 3:30 p.m., they saw Edson get off the bus dropping him off from school. Edson had switched from the Maniac Latin Disciples to the Spanish Gangster Disciples. Sanchez, Estrada, and a third male chased Edson, fought with him, and then ran off. Later that afternoon, Sanchez rejoined Miguel in the Winetree area. They saw Edson come out and talk to two members of the Sureños gang, and those two

12

Sureños came up to Miguel and Sanchez, saying they wanted to fight. Orozco persuaded them not to fight. Flores, Estrada, and Sanchez ran off to the park, but they returned shortly with Sanchez carrying Miguel's machete. They confronted three Sureños and Edson. Police showed up before anyone started fighting.

¶ 40    Miguel testified that he was with Sanchez, Estrada, Flores, and Rodriguez on Bridle Trail around 8 p.m. that evening. He walked off with Rodriguez, and he encountered some Sureños and Edson as he walked back alone, between buildings numbered 486 and 492. Orozco and Miguel's father joined them. As they talked, Miguel heard shots coming from Equestrian Drive. Orozco, who was facing north, was shot in the back.

¶ 41    Thirty minutes after the shooting, Miguel saw Sanchez and Estrada running south from north of the shooting scene, chased by Sureños. The judge overruled defense counsel's objection to the testimony about a chase. Miguel saw police "arresting [Sanchez] and putting him on the curb."

¶ 42    Defense counsel showed Miguel a still photograph taken from the dash camera videos she received from the State. The still shows a woman walking past the police car. Miguel confirmed that the photograph showed Leslie. The time stamp showed that she walked from the scene at the time when Flores and Sanchez said she had gone to find out who had been shot.

¶ 43    The prosecution then presented Sergeant Victor Chirio as an expert on gangs in Wheeling. Chirio said the Spanish Gangster Disciples, the Maniac Latin Disciples, and the Sureños "are all enemies of each other." Chirio knew Estrada from "[n]umerous gang contacts in Wheeling." Chirio testified that, at the scene, he saw Jose Garcia and Michael

13

Crost chasing Estrada and Sanchez. He knew Garcia and Crost as members of the Sureños gang. Chirio had never seen Sanchez before May 1, 2013.

¶ 44    Detective Bernie Conboy testified about the damage to the satellite dish and the bullet found at the scene. Conboy testified that the bullet came from south of where Orozco stood.

¶ 45    Robert Berk, a trace evidence analyst, testified that when a person fires a gun, the gun emits smoke containing lead, barium, and antimony and particles of those elements usually fall on the hands and clothes of the shooter. He tested Sanchez's clothes and the swabs taken of Sanchez's hands. He found no trace of any of the three elements on the clothes, and no trace of any of the three elements on the swabs. He explained that the test could show a negative result even though the subject fired a gun, if "the particles were either removed by activity, not detected, or were not deposited." He said, "normal hand activity is going to remove the residue over time." One would lose some residue by wiping one's hands or by sweating. He also found none of the three elements on the hand swabs and clothes of Estrada and Flores.

¶ 46    Detective Oropeza testified that he lied to Sanchez to induce him to confess.

¶ 47    Before putting Flores on the stand, the prosecutor, in a sidebar, noted that during the questioning in the video recording of Flores's interrogation in the police station, police referred to the "presumptive GSR" test. The prosecutor sought leave to ask Flores about his response to a police question that mentioned the results of that test. Defense counsel said, "presumptive gunshot residue tests are not reliable. There ha[ve] been no Frye hearings done on these. They are relatively new." The judge barred reference to the test but added that "if

14

[defense counsels] open the door again to this GSR, presumptive or not, I'm going to allow the State to call witnesses regarding that."

¶ 48    Flores, 16 years old at the time of trial, testified that Edson left the Maniac Latin Disciples and joined the Spanish Gangster Disciples. On May 1, 2013, around 3:30 p.m., Flores saw Sanchez and Estrada chase Edson, trying to beat him up. Around 9 p.m. that evening, Flores stood with Sanchez, Estrada, and some others on Bridle Trail when they heard four gunshots. Scheffler drove them from the area, but they came back to the parking lot by the 410 building to find out whether Miguel had been shot. Leslie got out of the car and when she returned she told them Orozco had been shot. Sanchez, Estrada, and Flores got out of Scheffler's car and headed toward Sanchez's car. Some Sureños started chasing them. Flores ran north, toward Pear Tree Lane, while Sanchez and Estrada ran the other way. Flores testified that when police handcuffed him and took him to the police station, he believed he was under arrest for murder.

¶ 49    Flores testified that in the statement video recorded at the police station, he lied to police about the shooting. He explained that police threatened to charge him with murder. He told police what they wanted to hear so that he could avoid the charges. He agreed to whatever Detective Bieschke suggested. Actually, he had never seen Sanchez with a revolver.

¶ 50    Flores explained that he believed Bieschke when Bieschke told him that Sanchez had already confessed and Sanchez felt bad for shooting Orozco. Flores believed "it would be, well, okay to say that [Sanchez] was the shooter then." He told Bieschke he threw the gun in the pond because otherwise "they were going to keep [him] in there." The prosecutor asked what evidence the officers said they had against Sanchez. The judge overruled defense

15

counsel's objection, finding that she had "brought it out." Flores said that police told him they "supposedly found powder or something like that, guns powder" on Sanchez's hands. The record shows no reference during cross-examination of Flores to gunshot residue or any test of anyone's hands or clothes.

¶ 51   Detective Bieschke testified that Flores initially told him that he was talking with Sanchez and other friends on Bridle Trail when they heard four shots. They all got into Scheffler's car, and Scheffler drove out of the neighborhood, but they returned to find out about Miguel. Defense counsel sought to elicit from Bieschke testimony about how Bieschke convinced Flores to change his account. Bieschke admitted that he downplayed the significance of the killer's acts, said that the shooting occurred accidentally, and told Flores he was not a bad person. Bieschke admitted that he asked Flores whether the gun "was possibly ditched in the pond," a possibility Flores had not mentioned prior to Bieschke's suggestion.

¶ 52   The jury saw several excerpts from the interrogations of Flores and Sanchez. Defense counsel sought to show the jury the parts of the video of Sanchez after the confession, when Sanchez pleaded for a phone call to his mother and when he said Bone Crusher had threatened him and Leslie. The judge denied the request.

¶ 53   A resident who lived just south of Equestrian Drive testified that when he heard the four shots on May 1, 2013, he went out to his driveway and saw a dark car speeding past with its lights off.

¶ 54   Miguel's father, Martin, testified that he was standing outside with Miguel, Orozco, and several members of the Sureños on May 1, 2013, when he heard the shots. He saw flashes

16

from the firearm as it discharged, with the flashes coming from Equestrian Drive, south of where he and the others stood.

¶ 55      In closing argument, the prosecutor said that Sanchez's tears during the interrogation showed that he suffered from a burden of guilt, and "you can see how that burden is in fact lifted from him after he admits being the person who shot Rafael."

¶ 56      Defense counsel argued that detectives fed an account to Flores and Sanchez and pressured them into assenting to that account. The detectives used lies about the evidence and emphasis on the words "accident" and "mistake" to induce acceptance of the false accounts.

¶ 57      In the prosecution's rebuttal, the jury heard the following:

"[PROSECUTOR]: It's bad enough to insult the integrity of the law enforcement people that were involved in this case. It's bad enough to put dishonor upon their reputations, the people that are out there saving our lives and our communities.

[DEFENDANT'S CO-COUNSEL]: Objection, Judge.

THE COURT: Overruled.

\*\*\*

[PROSECUTOR]: \*\*\* I've never seen anybody murdered by a cupcake before. He wants his Mommy. He is nothing but a sniveling, cowardly killer. That's what he is.

What were you doing out there all day, Jesus?

[DEFENDANT'S CO-COUNSEL]: Objection, Judge.

THE COURT: Overruled.

***

[PROSECUTOR]: [Flores] knew because when he was asked why were you being chased, what did he say? We were being chased by the Sureños because they thought we had shot someone, and that's why they were being chased—

MS. KOEHLER: Objection, Judge.

THE COURT: What's your objection?

MS. KOEHLER: It was the subject of a motion—

THE COURT: Overruled."

¶ 58   After the jury began deliberating, Sanchez moved for a mistrial based on several evidentiary errors and pervasive judicial bias against defense counsel. The judge denied the motion. The jurors deliberated for five hours before sending a note saying, "We are split." The judge ordered them to continue deliberating. Five hours later, the jury returned a verdict finding Sanchez guilty of the murder of Orozco but not guilty of attempting to murder Edson.

¶ 59                                Posttrial Proceedings

¶ 60   Defense counsel filed a motion for a new trial, listing numerous alleged trial errors. She also contended that the judge committed reversible error when he denied her request for a continuance so that the parties could have the records of Flores's stay at the rehabilitation center. The records from the rehabilitation center, produced after trial and appended to the motion for a new trial, included a note from Flores's therapist, which said,

"Client is expecting to be called back into court *** to testify again. Client *** reported that the guy currently on trial did not commit the murder. Client reported

18

that he knows who did it and he along with several other witnesses have told the authorities about it. However, right now the current guy is locked up and has been incarcerated for the past year."

¶ 61 Defense counsel did not have access to this note when she prepared for trial and when she cross-examined Flores, Bieschke, and other witnesses. The judge denied the motion for a new trial.

¶ 62 The judge sentenced Sanchez to 45 years in prison: 20 years for murder, plus 25 years for use of a firearm. Sanchez now appeals.

¶ 63                                    ANALYSIS

¶ 64 Sanchez argues on appeal that the evidence does not support the conviction, the court should have quashed the arrest and suppressed all of Sanchez's statements, and the prosecutor's improper conduct requires a new trial. We reverse the conviction due to the insufficiency of the evidence. For a fuller understanding of the ruling, we also discuss the motions to quash the arrest and suppress the statements.

¶ 65                              Motion to Quash Arrest

¶ 66 The prosecution did not argue that police had probable cause to arrest Sanchez on May 1, 2013, when officers handcuffed him, brought him to the police station in a police car and ordered him to sit in a windowless interview room. The prosecution contends that police acquired probable cause to arrest Sanchez at 4 a.m. on May 2, 2013, when they swabbed his hands, used a kit they referred to as a "presumptive GSR test," and obtained a positive result.

¶ 67    The parties do not dispute the essential facts regarding the treatment of Sanchez from 9:30 p.m. on May 1, 2013, to 4 a.m. on May 2. Accordingly, we review *de novo* the trial court's ruling denying the motion to quash the arrest. *People v. Love*, 199 Ill. 2d 269, 274 (2002).

¶ 68    Our supreme court set out the applicable principles:

"For purposes of the fourth amendment, a seizure is synonymous with an arrest, and an arrest effected without probable cause or a warrant based thereon violates the protections of the amendment. [Citation.] An arrest occurs when a person's freedom of movement has been restrained by means of physical force or by a show of authority. [Citation.] To determine whether an arrest has, indeed, occurred, the question to ask is whether a reasonable, innocent person would, under the circumstances, have considered herself arrested or free to leave." *People v. Williams*, 164 Ill. 2d 1, 11 (1994) (superseded in part by rule on other grounds as stated by *People v. Garstecki*, 234 Ill. 2d 430, 438 (2009)).

¶ 69    The supreme court identified "four factors that may be indicative of a seizure: (1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *People v. Luedemann*, 222 Ill. 2d 530, 553 (2006).

¶ 70    Here, Sergeant Conway's dash camera video shows that around 9:30 p.m. on May 1, 2013, Conway, in an authoritative tone of voice, directed Sanchez to come to him. Conway handcuffed Sanchez and ordered Sanchez to sit on the curb. Conway and other officers at the

20

scene had weapons. All the *Luedemann* factors indicate that Conway arrested Sanchez. In determining whether a reasonable innocent person would consider himself free to leave, we note that Flores, similarly treated, considered himself under arrest when Detective Bieschke handcuffed him, and Miguel, innocent of any wrongdoing here, testified that he saw police arrest Sanchez at the crime scene. Police illegally arrested Sanchez without probable cause around 9:30 p.m. on May 1, 2013.

¶ 71    After the illegal arrest, police questioned Sanchez twice about the murder, without advising Sanchez of his *Miranda* rights. Police also failed to record the questioning, in violation of section 103-2.1(b) of the Code of Criminal Procedure (Code). 725 ILCS 5/103-2.1(b) (West 2012).

¶ 72    The prosecution argues that the failure to record does not violate the Code because the officers who questioned Sanchez before 4 a.m. might not have known that Orozco had died, and therefore they questioned Sanchez only about a shooting, not about a murder. See 725 ILCS 5/103-2.1(e)(viii) (West 2012). But the Code expressly places on the prosecution the burden of showing that an exception excuses them from the rule requiring recording of interrogations. 725 ILCS 5/103-2.1(e) (West 2012). The prosecution presented no evidence of when Oropeza or other officers learned that Orozco had died, and therefore the prosecution did not meet its burden of showing the statement admissible under subsection (e)(viii). 725 ILCS 5/103-2.1(e)(viii) (West 2012).

¶ 73    Due to the violation of section 103-2.1(b), the trial court had a duty to suppress all subsequent statements from Sanchez unless the State showed by a preponderance of the evidence that the subsequent statements were both voluntary and reliable. 725 ILCS 5/103-

2.1(d), (f) (West 2012). To determine the voluntariness of a statement, the court should consider "the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises." *People v. Gilliam*, 172 Ill. 2d 484, 500-01 (1996). Here, Sanchez was 18 years old, with no criminal background, at the time of the interrogation. Police arrested him without probable cause and held him for 12 hours before he confessed. Most notably, the detectives told Sanchez he could not call his mother until he told them the truth about the shooting, and they told him they already knew he shot Orozco.

¶ 74        We find that on the issue of voluntariness, we cannot distinguish this case from *Haynes v. Washington*, 373 U.S. 503 (1963). Haynes, under arrest, repeatedly asked to call his wife. Police told him they would allow him to call once he cooperated with them. After 16 hours in custody, with no phone call, Haynes confessed. The Supreme Court said:

> "[T]he petitioner was alone in the hands of the police, with no one to advise or aid him, and he had 'no reason not to believe that the police had ample power to carry out their threats,' [citation], to continue, for a much longer period if need be, the incommunicado detention ***. Neither the petitioner's prior contacts with the authorities nor the fact that he previously had made incriminating oral admissions negatives the existence and effectiveness of the coercive tactics used in securing the written confession introduced at trial. The petitioner at first resisted making a written statement and gave in only after consistent denials of his requests to call his wife, and the conditioning of such outside contact upon his accession to police

demands. Confronted with the express threat of continued incommunicado detention and induced by the promise of communication with and access to family, Haynes understandably chose to make and sign the damning written statement; given the unfair and inherently coercive context in which made, that choice cannot be said to be the voluntary product of a free and unconstrained will." *Haynes*, 373 U.S. at 514.

¶ 75    Following *Haynes*, we find that the uncontested evidence shows that Sanchez did not voluntarily make the statements admitted against him at trial. By refusing Sanchez's request to call his mother, the detectives also violated section 103-3(a) of the Code. 725 ILCS 5/103-3(a) (West 2012).

¶ 76    Even if a court could regard the statements as voluntary, the prosecution, in its arguments at trial, conceded that the jurors should not rely on almost all of the statements Sanchez made in the lengthy interrogation. The prosecutor argued that the jurors should not believe Sanchez's statement that Estrada brought the gun, as the prosecutor, relying solely on Flores's assent to the detectives' suggestions, argued that Sanchez purchased the gun a week before the shooting and brought it to the scene. The prosecutor argued that the jurors should not believe Sanchez's statement that Sanchez had the gun between the 540 and 544 buildings when it discharged, as the prosecutor did not dispute the overwhelming evidence that the fatal shot came from Equestrian Drive. The prosecutor argued that the jurors should not believe Sanchez's statement that the gun discharged accidentally. Because the police came to the scene only after Orozco had been shot, the prosecution cannot accept as true Sanchez's statement that before he got hold of the gun, he, Flores, and Estrada all walked from

23

Scheffler's car by the 410 building toward Sanchez's car by the 492 building, staying north of Pleasant Run Drive to avoid police. The only words Sanchez spoke that the prosecutor wanted jurors to believe came when Sanchez said he held the gun and "it went off."

¶ 77    Despite the prosecution's rejection of virtually every statement Sanchez made, even in the course of his confession, the prosecutor argues that Sanchez's statements count as reliable within the meaning of section 103-2.1(f) of the Code. 725 ILCS 5/103-2.1(f) (West 2012). In *People v. Harper*, 2012 IL App (4th) 110880, ¶ 34, the court held that, to determine the reliability of statements for section 103-2.1(f), "the trial court can consider such things as the age and mental capacity of the defendant, the presence or absence of coercion, the length of the interrogation, whether the defendant had been deprived of sleep or food and water or use of a bathroom, whether the defendant—if an addict—was in the throes of withdrawal, and any other factor that may affect the reliability of the statement." The court cited no legal authority for the list, which duplicated factors pertaining to voluntariness. *People v. Harper*, 2013 IL App (4th) 130146, ¶ 20. The *Harper* court listed only one factor not related to voluntariness: "any other factor that may affect the reliability of the statement." *Harper*, 2012 IL App (4th) 110880, ¶ 34.

¶ 78    "We emphasize that whether defendant's statement was reliable is a separate inquiry from whether it was voluntary." *People v. Harris*, 2012 IL App (1st) 100678, ¶ 66. Factors other than voluntariness have bearing on the reliability of a confession. Courts have frequently looked to corroboration as the most significant indicator of the reliability of confessions. See *Chambers v. Mississippi*, 410 U.S. 284, 300 (1973); *People v. Bowel*, 111 Ill. 2d 58, 67-68 (1986). The *Bowel* court held that, for a confession, "indicia of

24

trustworthiness [include] that (1) the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the statement was corroborated by other evidence; (3) the statement was self-incriminating and against the declarant's interest; and (4) there was adequate opportunity for cross-examination of the declarant." *Bowel*, 111 Ill. 2d at 67. We hold that courts should consider corroboration of the statement, especially corroboration of any new assertions of fact that police did not know before, in determining the reliability of a confession under section 103-2.1(f). The other *Bowel* factors may also affect the confession's reliability.

¶ 79    Bieschke's questioning of Flores produced some corroboration of Sanchez's confession. Flores said Sanchez headed toward the 540 and 544 buildings, holding the gun, shortly before Flores heard the shots. But most of Flores's recanted video recorded statements shown at trial flatly contradicted Sanchez's confession. Sanchez said Estrada brought the gun; Flores said Sanchez bought the gun the week before the shooting and brought it to the scene. Sanchez described the gun as black with a black handle; Flores described the gun as silver with a brown handle. Sanchez said Estrada took the gun from him and ran west from the shooting scene; Flores said Sanchez took the gun, headed east, and threw the gun in the pond north of the 430 building.

¶ 80    Eyewitness testimony and the physical evidence also contradict Sanchez's confession. The shot came from Equestrian Drive, south of Orozco, and hit him in the back as he stood facing north. The shot did not come from anywhere near the spot where Flores confirmed that Sanchez stood when Flores, in his recanted statement, said he heard the shots. Moreover, if Sanchez fired the shots from Equestrian Drive and lied about it, as the prosecutor

25

theorized, Sanchez would have stood no more than 40 yards from his car, which police found parked on the west side of the 492 building. He would not have had cause to circle north of Pleasant Drive if, as the prosecutor argued, he tried to get to his car to escape the scene. The initial account Sanchez, Flores, Estrada, Leslie, and others gave police explains how Sanchez arrived north of the shooting scene, trying to go from Scheffler's car by the 410 building, to Sanchez's car by the 492 building, when Sureños started to chase him and he headed toward the police. The evidence at trial did not substantially corroborate Sanchez's confession.

¶ 81    The other *Bowel* factors also militate against a finding of reliability. Police pressured the statement out of Sanchez, and Sanchez hoped police would allow him to call his mother if he confessed, so he stood to gain from the confession. Considering all the *Bowel* factors, the trial court should have found Sanchez's confession unreliable.

¶ 82    We hold that section 103-2.1 required the court to suppress the video recorded statements of Sanchez, made after police initiated unrecorded custodial questioning in a murder investigation, when police had not informed Sanchez of his *Miranda* rights. Police induced an involuntary, unreliable confession. The trial court erred when it denied the motion to quash the illegal arrest and the motion to suppress statements.

¶ 83                                  Sufficiency of the Evidence

¶ 84    No physical evidence connected Sanchez to the crime. Police never found the gun or the casings from the fired bullets, and they found only one of the four fired bullets. The prosecutor conceded that police never found the bullet that killed Orozco. A reasonable trier of fact could conclude that the many persons found near the scene, including those persons who, according to police, acted with hostility to the police, may have taken from the area the

26

evidence before police arrived on the scene. No witness testified that Sanchez held a gun. No witness saw Sanchez on Equestrian Drive, where the shots came from. Sanchez's hands and clothes bore no trace of antimony, no trace of barium, and no trace of lead. The testimony of all witnesses and all the physical evidence fits well with the initial account Sanchez, Flores, Estrada, Leslie, and others gave police. That account, which matched Flores's testimony in court, is also consistent with Miguel's testimony that he stood on Bridle Trail, talking with Sanchez and the others, before he left with Rodriguez to head to the 490 building where Pettibone lived. When Sanchez and the others realized the shots hit someplace near the 490 building, they had reason to fear Miguel had been shot.

¶ 85    Moreover, the prosecution failed to present a coherent theory of the case. According to the prosecution, Sanchez went home to pick up his gun some time after the fight with Edson at 3:30 p.m. He spent the rest of the afternoon and evening with Miguel and other friends, getting into a confrontation with some Sureños after Edson went to the Sureños for help. But Edson, according to the prosecution's witnesses, flipped from the Maniac Latin Disciples to the Spanish Gangster Disciples, and Sureños count both of those gangs as enemies. Inexplicably, Edson did not appeal to the Spanish Gangster Disciples for help.

¶ 86    Later that evening, Sanchez was talking with some Maniac Latin Disciples and others on Bridle Trail, when Miguel left to escort Rodriguez to the 490 building. According to the prosecution, a few minutes later, knowing that his friend and gangmate Miguel had gone toward the 490 building, Sanchez walked unseen to Equestrian Drive and fired wildly at a group that included Miguel and Miguel's father. One bullet struck a satellite dish, two may not have hit anything notable, and one bullet killed Orozco. Then, instead of walking a few

27

feet to the other side of the 492 building, where he had parked his car, Sanchez ran around Winetree for half an hour, with no apparent purpose other than to work up a sweat and persuade Sureños to chase him, while Estrada took the gun over to the pond north of Pleasant Run Drive and threw the gun in the pond. Notably, in the prosecutor's account, Estrada did not take the gun to the much closer pond just south of Bridle Trail. According to the prosecution, Sanchez, Flores, Estrada, Scheffler, and Leslie concocted a consistent account for their actions before and after the shooting. They all stuck to the story when they spoke to police, except that after 12 hours in custody, Sanchez finally said that he held the gun when it discharged. He started to feel so relieved from unburdening himself that he started crying during the questioning well before he actually admitted to holding the gun. The admission made him feel completely unburdened, even though he continued to lie about when and how he got the gun, where he stood, whether police had arrived in the area before the shooting, and all other details of the shooting.

¶ 87     The overwhelming implausibility of the prosecution's account presents us with the question: why did a jury of 12 ostensibly reasonable persons sign a verdict convicting Sanchez of murder? We find two factors that likely led to the verdict. First, confessions have exceptional persuasive force (see *People v. Clay*, 349 Ill. App. 3d 24, 30 (2004)), and as we have already concluded, the jury should not have heard Sanchez's incriminating statements. Second, the prosecutor insinuated that Sanchez's hands had gunshot residue and the Sureños accused him of shooting Orozco, and the prosecutor shifted the jurors' focus from the evidence against Sanchez to the issues of whether defense counsel had grievously insulted

28

police and whether jurors doubted the integrity of the officers. See *People v. Fluker*, 318 Ill. App. 3d 193, 202-03 (2000).

¶ 88   We note that, if not for the constraints imposed on the detectives by section 103-2.1(b) of the Code, the video recording requirement, the detectives would have had a much better opportunity to obtain the signatures of Sanchez and Flores on statements more consistent with the physical evidence, making the statements more plausible while no less false and no less coerced. We recommend that if police departments again use the so-called "presumptive GSR test," the departments should inform officers and the subjects of the tests about what the tests actually measure, and what kinds of contact can produce positive test results. We also recommend the consideration of possible sanctions against the officers for violating section 103-3(a) of the Code, which establishes the suspect's right to make phone calls. 725 ILCS 5/103-3(a) (West 2012).

¶ 89   While our supreme court has expressly approved the use of deception to obtain confessions (see *People v. Martin*, 102 Ill. 2d 412, 427 (1984)), this case shows us how the use of deception in interrogations leads to false confessions. Deceptive practices contribute to an atmosphere in which whole communities act with hostility toward police. If police want the members of the community to treat them with respect and help them in their efforts to reduce crime, police should renounce the use of deceptive practices in law enforcement so that the members of the community learn that they can trust police officers to treat them honestly. The practice of deception in interrogations and other settings can destroy the trust needed as a foundation for the relationship between police officers and the members of the communities the police officers have a duty to serve and protect. A revision of police

department rules, and the actual imposition of significant sanctions for deceptions, might help repair the strained relations between police and some of the communities they have a duty to serve.

¶ 90                                    CONCLUSION

¶ 91        No witness saw Sanchez with a gun. No witness saw Sanchez near the spot from which the fatal shot came. The prosecution showed no connection between Sanchez and the single spent bullet found at the scene. Police found no trace of antimony, barium, or lead on Sanchez's hands and clothes. The prosecutor did not present a plausible account of Sanchez's actions around the time of the shooting, and police admitted that Sanchez and the persons with him shortly before the shooting gave a plausible, consistent, exonerating account of Sanchez's conduct.

¶ 92        We hold that the prosecution did not present sufficient evidence to sustain the conviction. But here, the record leads to a further conclusion. The evidence convincingly shows that Sanchez did not murder Orozco. Accordingly, we reverse the judgment of the trial court.

¶ 93        Reversed.

¶ 94                                     APPENDIX

