2021 IL App (1st) 181483

No. 1-18-1483

Second Division
May 18, 2021

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 CR 12028 02 |
| EUGENE NELSON, | ) ) ) | Honorable Mauricio Araujo |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a 2015 jury trial, defendant Eugene Nelson was convicted of delivery of a controlled substance and sentenced to seven years in the Illinois Department of Corrections. On appeal, defendant seeks reversal of his conviction or, in the alternative, remand for a new trial because (1) the jury was not properly sworn before trial and (2) there was insufficient evidence to convict him. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      Defendant was charged by indictment with delivery of a controlled substance (720 ILCS 570/401(c)(1) (West 2014)). The indictment alleged that on June 20, 2014, defendant, along with codefendant Travaris Stevenson, delivered "1 gram or more but less than 15 grams" of heroin to an undercover police officer. In February 2015, defendant was tried before a jury, which resulted in a hung jury.[1] In November 2015, defendant was tried in a second jury trial.

¶ 4                          A. Instructions and *Voir Dire* Proceedings

¶ 5      Prior to jury selection on November 2, 2015, the trial court provided preliminary instructions to the jurors. The court advised the jurors that the instructions were "neither [their] final nor [their] complete instructions" as "those [would] come after [they] heard all the evidence and the closing arguments of the attorneys." The court then instructed the jurors that defendant was presumed innocent of the charges against him, that the presumption remained with him at every stage of the trial, and that "it is not overcome unless *** they are convinced beyond a reasonable doubt that the defendant is guilty" after hearing all the evidence. The court noted that the prosecution had the burden of proof and defendant was not required to prove his innocence or present evidence on his own behalf. The court then informed the jurors that their role was to be "judges of facts." The court noted that "[i]n considering the testimony of any witness, [they] may take into account [the witness's] opportunity and ability to observe, their memory, their manner while testifying, any interest, bias or prejudice they may have, and the reasonableness of their testimony considered in light of all the evidence." The court emphasized that the "verdict must be based only on the law and the evidence in this case" as "[s]ympathy, bias, or prejudice have no

_____

[1]Stevenson was tried in a bench trial and found guilty.

place in this trial" and their "oath as juror requires [that they] set aside any sympathy, bias, or prejudice [they] may have." Lastly, the court stated that defendant did not have to testify. The court then instructed the jurors to raise their hand if they did not understand these instructions or "basic propositions of law." No hands were raised.

¶ 6    Following individual *voir dire*, 12 jurors and 2 alternates were selected. The jury was then instructed to return the next day for trial.

¶ 7    On November 3, 2015, all parties appeared, and outside the presence of the jury, the court granted a motion to exclude witnesses. The court then gave Illinois Pattern Jury Instructions, Criminal, No. 1.01A (approved July 26, 2013) (hereinafter IPI Criminal No. 1.01A) to the jury, and the State proceeded with its opening statement.[2] The jury was not sworn in.

¶ 8                                    B. Jury Trial

¶ 9    Following opening statements, the State called Chicago police officer Armando Ugarte to testify. Officer Ugarte was assigned to the police department's narcotics unit. On June 20, 2014, he was on duty as an undercover "buy officer." Others on his unit team worked as surveillance and enforcement officers. Prior to the date in question, he served as an undercover buy officer on approximately 30 occasions.

¶ 10    Officer Ugarte testified that he was instructed by another officer on the team to go to the area of 1546 South Ridgeway Avenue in Chicago. He drove in an unmarked vehicle and was dressed in civilian clothes. After arriving at the location, Officer Ugarte observed a man sitting on the front porch of an abandoned building. Officer Ugarte identified that man as defendant in open

---

[2]Illinois Pattern Jury Instruction No. 1.01A is titled "Preliminary Cautionary Instructions Before Opening Statements." See Illinois Pattern Jury Instructions, Criminal, No. 1.01A (approved July 26, 2013).

court. He testified that he pulled his car to the curb and asked defendant, "You up, Bro?" According to Officer Ugarte, this phrase was used to inquire if an individual had narcotics for sale.

¶ 11    In response, defendant stood up and approached Officer Ugarte's vehicle. Defendant walked to the driver's side window and spoke to him from an arm's length distance. Defendant asked him, "How many D do you want?" Officer Ugarte explained that the term "D" referred to heroin. Officer Ugarte told defendant that he wanted "three." Defendant then walked away from the vehicle, headed "north" on Ridgeway Avenue, and "engaged" with another individual who was later identified as Stevenson. Defendant and Stevenson were about four buildings away from him. Officer Ugarte testified that there was nothing obstructing his view of the individuals. He observed defendant and Stevenson engage in a "hand-to-hand transaction." Defendant then returned to the vehicle with a closed fist. At that point, defendant put his hand into the car, opened his fist, and dropped three blue-tinted plastic bags containing what Officer Ugarte believed to be heroin. In exchange for the bags, Officer Ugarte gave defendant $30 in prerecorded funds.

¶ 12    Officer Ugarte then drove away from the scene, contacted the other officers on his team, and informed them that a narcotics transaction had taken place. He gave a detailed description of defendant's clothing, including his hat, shirt, pants, and shoes. Officer Ugarte returned to the scene 5 to 10 minutes later and saw that enforcement officers had detained defendant. Officer Ugarte told the officers that defendant was the one who sold him the heroin. Officer Ugarte testified that it was "well-lit" around that time, he had an unobstructed view of defendant's face, and he had no trouble recognizing defendant as the person who sold him the heroin. He testified that the three bags containing the suspected heroin were placed into a large inventory bag, which was provided by the police department. Information such as "the date, the time, location, *** [and] substance of the evidence is filled out on that bag." Officer Ugarte testified that his name and star number

was on the bag. Additionally, his "signature, *** description of [the evidence], address, the defendant's name" was also included. He filled out this information shortly after receiving it from defendant. Officer Ugarte testified that, using the police department's I-CLEAR program, he was able to generate a unique inventory number for the evidence. The inventory number was 13201611. The bags were heat-sealed and later submitted to the Illinois State Police (ISP) Crime Lab.

¶ 13 On cross-examination, Officer Ugarte testified that he had never seen defendant or had any information that he had been involved in the sale of narcotics prior to June 2014. On the day in question, Officer Ugarte did not see defendant "involved in any narcotics transactions" nor did he "suspect" it. He also did not observe any narcotics activity on the block that day. Nevertheless, he asked defendant if he was selling drugs. He testified that there was no recording of his conversation with defendant. He did not see defendant "specifically hand anything to [Stevenson]," but he did observe them "grabbing each other['s]" hands. He did not see defendant give the prerecorded funds to Stevenson or "see what [defendant] did with [it]" as he had driven away at that point. The prerecorded funds were never recovered, and the heroin bags were not submitted for fingerprints or DNA testing.

¶ 14 Chicago Police Officer William Lepine testified that he was assigned to the narcotics unit. On the day in question, he was working on the same team with Officer Ugarte. His role was that of a surveillance officer. He was dressed in civilian clothes and was in an unmarked vehicle. His team had formulated a plan to make a control purchase, and the operation was to be conducted near the area of 15th and Ridgeway Avenue in Chicago. He instructed Officer Ugarte to come to that location, and shortly thereafter, Officer Ugarte arrived at the scene. Officer Lepine had an unobstructed view of Officer Ugarte's interaction with defendant. He described the sequence of events in a similar manner as Officer Ugarte. He also identified defendant in open court.

¶ 15     After Officer Ugarte had driven away, Officer Lepine remained at the scene. He observed defendant walk back towards Stevenson and give him what appeared to be money. He could tell it was money because it was "green paper." He never lost sight of defendant's hand from the time he received the money from Officer Ugarte until he handed what appeared to be "green paper" to Stevenson. Officer Lepine continued to watch as Stevenson approached another individual and gave him the money. This third individual took the money, "walked a little bit east out of [Officer Lepine's] view," and left the scene. Officer Lepine continued to observe the scene to see if the other person would come back. The man did not return. Shortly thereafter, Officer Lepine terminated the operation and radioed for enforcement officers. Both defendant and Stevenson were detained. Officer Lepine then observed Officer Ugarte return to the scene. Officer Ugarte did not exit his vehicle but was "continuously slowly driv[ing] by." Officer Ugarte radioed Officer Lepine regarding defendant and Stevenson. The individual to whom Stevenson gave the money was not located.

¶ 16     On cross-examination, Officer Lepine testified that he directed Officer Ugarte to approach defendant because he was "standing by a vacant lot or by the porch" and "in [his] experience, [he had] seen that same scenario a hundred times." It was also based on his prior knowledge of the location as being a "high narcotic area." However, he had not seen defendant engage in any transaction when he initially set up the surveillance. Officer Lepine testified that defendant walked right across the street, "maybe two or three feet north" to Stevenson. He observed a "hand motion" between defendant and Stevenson, where "it appeared that the defendant was reaching out his hand, an open hand, and then Stevenson was making some sort of motion with a closed fist." However, Officer Lepine did not see "anything drop in his hand."

¶ 17    Chandra Gritman, a forensic scientist with the ISP Forensic Science Center in Chicago testified as follows. She analyzed the three bags and determined that they contained 1.1 grams of heroin. The evidence bag had an inventory number of "13201611."

¶ 18    After admitting the narcotics into evidence, the State rested.

¶ 19    The jury was then dismissed for a lunch break. During the break, the court informed both parties that the jury had not been sworn. In response to the court's inquiry as to how the parties wished to proceed, defense counsel moved for mistrial. The State responded that the motion for mistrial should be denied based on this court's decision in *People v. Abadia*, 328 Ill. App. 3d 669 (2001). The State argued that *Abadia* was instructive as it dealt with a nearly identical issue where a jury trial had commenced without the jury being sworn until the second day of trial. The State noted that the court in *Abadia* found the belated swearing harmless because pretrial instructions were given, and it did not prejudice the defendant in any manner. In reply, defendant argued that *Abadia* was distinguishable because no objections were made in that case, while defendant had made an objection in the present case. With respect to the objection, the trial court stated that "you've objected because I pointed out to everybody that they hadn't been sworn. Nobody noticed." The trial court then noted that IPI Criminal No. 1.01A had not been in existence when *Abadia* was decided but agreed with the State, finding that "although not perfect,*** [the jury oath] can come just before instructions and before [the jurors] begin deliberations." Accordingly, the trial court denied the motion. The jury returned from recess and was immediately sworn in.

¶ 20    Defendant was then called and testified as follows. He was volunteering with the CeaseFire program and Better Boys Foundation on the day in question. Both CeaseFire and Better Boys Foundation had programs designed to "get young guys off the street." Defendant was tasked with "build[ing] up endorsements," which involved going "out in the street and talk[ing] with the young

guys" about the program. He was instructed to start at "16th [Street] and Homan [Avenue] and work [his way] back up and down the streets." Defendant was on the 1500 block of Ridgeway Avenue when he saw a group of young men standing in the middle of the block. Defendant introduced himself and his organization to the group. After talking to the group for a few minutes, defendant stated that the men were "taking care of some of they business *** so [he] told them [he would] go across the street and when they finish, [he] would be back." Defendant then walked across the street to a vacant lot which was by an abandoned building. He denied sitting on the porch of the abandoned building and claimed he was, instead, 15 feet away from it.

¶ 21 As defendant was waiting, an unknown man pulled up at the curb in a car and asked him if he had "any blows." Defendant told the man "[j]ust cause you see a black man standing out here, he got to be selling drugs?" The man responded, "Come on, Bro, Can I get served?" Defendant denied agreeing to buy or give the man drugs. He denied asking him how much he wanted. Instead, defendant walked down the street to talk to the young men again. He denied ever giving or receiving anything from the young men and denied knowing Stevenson. The car with the man remained on the block, and as defendant walked past the car, the man again asked defendant if he could "get served." Defendant did not respond. As he turned to the corner of the block, a police vehicle pulled up and he was arrested. An officer searched defendant and found $2.41 that defendant claimed was for bus fare.

¶ 22 The defense rested.

¶ 23 The jury found defendant guilty of delivery of a controlled substance. Defendant filed a motion for a new trial. In his motion, defendant asserted, *inter alia*, that the court deprived him of his right to a fair trial by "failing to swear the jury at the beginning of the trial." The court denied

the motion, finding that the procedural error did not deny defendant a fair trial. Defendant was then sentenced to seven years in prison.

¶ 24                                    II. ANALYSIS

¶ 25    On appeal, defendant argues that his motion for mistrial should have been granted where the jury was not properly sworn before the start of trial. Defendant also contends that his conviction should be reversed because the State did not prove beyond a reasonable doubt that a narcotics transaction had occurred. Specifically, defendant argues that the State did not recover any prerecorded funds or heroin and the "officers' testimony about the purported deal was improbable."

¶ 26    The State, on the other hand, contends that IPI Criminal No. 1.01A and the court's preliminary instructions prior to *voir dire*, which included the *Zehr* principles (see *People v. Zehr*, 103 Ill. 2d 472, 477 (1984)), were "affirmations—to fairly and impartially decide the case." Because these affirmations "literally mirror the oath that is traditionally administered at the beginning of a trial," the State argues that the belated jury oath in this case did not "amount to a structural defect." The State further contends that the evidence was sufficient to support defendant's conviction because there was credible testimony.

¶ 27                                    A. Jury's Oath

¶ 28    Defendant asserts that his motion for mistrial should have been granted. However, the trial court, relying on the State's citation to *Abadia*, denied the motion and belatedly swore in the jury. Defendant maintains that the court's failure to properly swear in the jury and its subsequent denial of the motion for mistrial was error, requiring reversal and remand for a new trial before a properly sworn jury.

¶ 29 "[N]o Illinois statute or Supreme Court Rule prescribes the form or language of the criminal trial juror's oath ***." *People v. Moon*, 2020 IL App (1st) 170675, ¶ 37. Nevertheless, the juror's oath has been defined as a promise to lay aside one's "impression or opinion and render a verdict based on the evidence presented in court." *People v. Williams*, 40 Ill. 2d 522, 531-32 (1968). Although pretrial instructions may achieve this effect, the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-4(g) (West 2014)) and Illinois Supreme Court Rule 434(e) (eff. Feb. 6, 2013) provide that a jury be "impaneled" and "sworn." A sworn jury is necessary for the constitutional presumption of an impartial jury. *Lockhart v. McCree*, 476 U.S. 162, 183-84 (1986). A sworn jury is also deemed vital, as it marks the moment at which jeopardy attaches. *Martinez v. Illinois*, 572 U.S. 833, 840 (2014) (*per curiam*). In *Abadia*, this court noted that a juror's oath is a "solemn vow to serve the rule of law which governs the social contract of our society." *Abadia*, 328 Ill. App. 3d at 676. Given the important role of a sworn jury, we find that the failure to administer the oath at the beginning of trial constituted error. Our inquiry then turns to the effect of that error on defendant's constitutional right to an impartial jury. However, before doing so, we must determine the applicable standard of review of a trial court's ruling on a motion for mistrial.

¶ 30 Generally, a mistrial should be granted where an error of such gravity has occurred that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice. *People v. Sims*, 167 Ill. 2d 483, 505 (1995). The trial court's denial of a defendant's motion for a mistrial will not be disturbed unless the denial was a clear abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's decision is "fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." *People v. Ortega*, 209 Ill. 2d 354, 359 (2004).

¶ 31    Defendant, citing *People v. Campos*, 349 Ill. App. 3d 172 (2004), urges that the proper standard of review here is *de novo*. He maintains that, in this case, there are no disputed issues of fact and all that remains is a question of law about whether the trial court correctly applied the law. As such, defendant contends that the more deferential abuse of discretion standard of review is inapplicable.

¶ 32    In *Campos*, the trial court denied the defendant's motion to dismiss charges against him following a mistrial. *Id.* at 173. On appeal from the denial, the defendant argued for *de novo* review of the court's ruling. *Id.* at 174. The Second District rejected the defendant's argument, finding that the issue was the intent of the prosecutor himself, which was a factual question that the trial court was in the best position to determine. *Id.* at 175.

¶ 33    A similar result yields here. The trial court was in the best position to observe the jurors and to evaluate whether they comprehended the later-given oath and the question regarding their ability to view the testimony and evidence that they heard prior to being sworn in the same manner as after they had been sworn. The trial court asked the jurors to raise their hands if they could not honor the oath and if they could not honor this oath for the testimony heard before the oath had been given. No juror raised his or her hand. Accordingly, we review the trial court's denial of defendant's motion for mistrial for abuse of discretion.

¶ 34    Having determined the appropriate standard of review for the court's denial of a mistrial, we must yet determine the appropriate standard to evaluate the effect of the late sworn jury.[3] Citing cases from our sister jurisdictions, defendant contends that reviewing courts have routinely found

_____

[3]Later in this opinion, we discuss the doctrines of plain error and harmless error. These doctrines are not synonymous with standards of review, but as noted by our supreme court in *People v. Herron*, 215 Ill. 2d 167, 178 n.1 (2005), are more aptly described as standards to assist the reviewing court in determining when excusal of forfeiture is appropriate.

structural error, requiring reversal, when a defendant's conviction resulted from an unsworn jury.[4]

We acknowledge that some courts in other states have held that a trial with an unsworn jury is a nullity or a structural error not subject to forfeiture or the harmless error analysis. See, *e.g.*, *Harris v. State*, 956 A.2d 204, 213 (Md. 2008) ("a jury which has never been sworn falls into the same 'structural error' category," and therefore, "the complete failure to swear the jury can never be harmless error"); *Barclay v. State*, 39 So. 3d 209, 211 (Ala. Crim. App. 2008) (as verdict by unsworn jury is a nullity, claim of such is jurisdictional); *Miller v. State*, 84 So. 161, 162-63 (Miss. 1920) (reversible error where jury had not been sworn until after both sides rested). But see *People v. Cain*, 869 N.W.2d 829, 835-40 (Mich. 2015) (where jury was not sworn prior to defendant's conviction, and the error was not preserved, reviewing court found no reversible error in the absence of a showing of prejudice); *State v. Vogh*, 41 P.3d 421, 424-25 (Or. Ct. App. 2002) (failure to swear in jury is not structural error requiring automatic reversal). However, here in Illinois, our supreme court has recognized structural error in only a limited class of cases (People *v. Glasper*, 234 Ill. 2d 173, 198 (2009) (citing *Neder v. United States*, 527 U.S. 1, 8 (1999))), trial by a biased jury being one of them (*People v. Thompson*, 238 Ill. 2d 598, 610-11 (2010)). We find it significant, however, that the *Thompson* court did not find the trial court's failure to comply with the jury admonishments of Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) to necessarily result in a biased jury. *Thompson*, 238 Ill. 2d at 610-11.[5] Defendant has not cited to any Illinois

---

[4]In Illinois, automatic reversal is required where an error is deemed " 'structural,' *i.e.*, a systemic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009) (quoting *Herron*, 215 Ill. 2d at 186).

[5]Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) codified the holding in *Zehr*, 103 Ill. 2d at 477, which mandates *voir dire* examination of potential jurors to ensure against prejudice related to a criminal defendant's exercise of certain constitutional protections.

case that includes belated jury instructions within the class of errors deemed structural, and we decline any invitation to do so.

¶ 35    The State notes that no Illinois authority provides that a failure to administer a jury oath warrants *per se* reversal. Our research has yielded no cases, and defendant has failed to cite to even one. In fact, in *Moon*, the jury was never sworn but had been administered the *voir dire* oath. *Moon*, 2020 IL App (1st) 170675, ¶ 42. The court noted that it was "faced with a clear error of a trial by a jury never sworn *** and an equally clear forfeiture of [the] defendant's claim" as the defendant raised the issue in a post-trial motion but did not object at trial. *Id.* The court then analyzed defendant's forfeited claim as a matter of plain error. *Id.* ¶ 44.

¶ 36    We further note that although case law from jurisdictions other than our own may be cited as persuasive authority, we are not bound to follow it. See *In re Parentage of Scarlett Z.-D.*, 2015 IL 117904, ¶ 55 ("decisions from our sister state courts are not binding on the courts of this state"). Additionally, and significant here, this is not a case, like *Harris* and those others cited in defendant's brief, in which the jury was never sworn. Thus, even though enlightening, those decisions are inapposite, and we need not consider them further.

¶ 37    Apparently seeking to avoid the consequences of a potential finding of forfeiture, defendant next contends that reviewing courts typically conclude error was harmless if the jury was sworn before its verdict and the error was not preserved in the trial court. What defendant describes here is the exact scenario in *Abadia*, the case cited by the State to the trial court and relied upon by the court in denying defendant's motion for mistrial.

¶ 38    In *Abadia*, the defendants argued that they were entitled to a new trial because the jury was not sworn until the conclusion of the first day of testimony. *Abadia*, 328 Ill. App. 3d at 676. At trial, defense counsel objected neither to the failure of the court to administer the oath on the first

day of trial nor to the belated administration of the oath on the second day of trial. *Id.* Although the defendants "waived" the issue by raising it for the first time on appeal, this court decided to address the issue as one of "first impression" and reasoned that "the goals of obtaining a just result and maintaining a sound body of precedent" had "overrid[den] considerations of waiver." (Internal quotation marks omitted.) *Id.* at 675-76. As to the issue of the delayed jury oath, the court found that the "extensive nature of the judge's pretrial instructions" and the fact that the jury was sworn prior to deliberations obviated the court's "concern that the proceeding was tainted." *Id.* at 677. The court noted that the pretrial instructions in that case "preserved the integrity of the proceeding until the juror's oath was administered." *Id.* Accordingly, the court found that a one-day delay in giving the oath did not deprive the defendant of a fair trial. *Id.* Citing cases from other jurisdictions as persuasive authority, the court concluded that there was no prejudice, and the error was harmless. See *id.* at 677-78.[6] We acknowledge that a number of courts in our sister jurisdictions have held that the harmless error doctrine applies when the oath is administered before jury deliberations. See, *e.g.*, *State v. Godfrey*, 666 P.2d 1080, 1081 (Ariz. Ct. App. 1983) ("failure to swear the jury until the case has commenced is generally harmless error *** where there is no actual prejudice shown and the oath is administered prior to deliberations"); *People v. Clouse*, 859 P.2d 228, 233 (Colo. App. 1992) ("failure to swear in the jury at this stage of the trial constituted harmless error" because "[t]he record confirms that the jury was sworn in long before deliberations, and the trial court informed the jury that the oath applied retroactively"); *Adams v. State*, 690 S.E.2d 171, 173 (Ga. 2010) ("in the absence of a showing of actual prejudice [citation],

---

[6]The defendant in *Abadia* failed to object to the claimed error either at trial or in a posttrial motion. Although the court characterized the error as "harmless," because the error had not been properly preserved, we believe that the applicable standard for evaluating the forfeited claim was "plain error." See *Herron*, 215 Ill. 2d at 182.

there is no reversible error if a belated oath is given prior to the jury's deliberations"); *People v. Morales*, 570 N.Y.S.2d 831, 833 (App. Div. 1991) ("a delay in swearing a jury is merely a technical deviation and not *per se* reversible").

¶ 39    Although not factually "on all fours" with our case, we find *Abadia* instructive. Nevertheless, defendant entreats us to instead follow *Steele v. State*, 446 N.E.2d 353 (Ind. Ct. App. 1983). In *Steele*, the court held that the trial court's failure to grant the defendant's motion for mistrial when the oath had not been administered until after five of the prosecution's witnesses had testified was reversible error. *Id.* at 354. We believe that *Abadia*, and those cases cited above that applied a harmless error analysis, reflects the better view. Thus, we hold that where the jury is sworn belatedly, but prior to deliberations, a harmless error analysis is available.

¶ 40    Defendant argues that even if this court decides that the harmless error doctrine applies in this case, the State cannot meet its burden to prove that the error was not harmless beyond a reasonable doubt. The State argues, however, that defendant "forfeited [his jury] claim by failing to bring the oversight to the trial court's attention at the beginning of the trial or mak[ing] a timely objection."

¶ 41    A harmless error analysis is conducted when a defendant has preserved an issue for review. *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009). In general, harmless error is " 'an error committed in the progress of the trial below *** which was not prejudicial to the rights of the party assigning it.' " *People v. Singer*, 256 Ill. App. 3d 258, 265 (1993) (quoting *People v. Jenkins*, 209 Ill. App. 3d 249, 257 (1991)). In a harmless error analysis, the State bears the burden of establishing that the defendant was not prejudiced. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). "In other words, the State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error." *Id.* The harmless

error doctrine, however, does not apply where the defendant failed to make a timely objection. *McLaurin*, 235 Ill. 2d at 495. Where a defendant has forfeited appellate review of an issue, the reviewing court will consider only plain error. *Id.* Although both doctrines require the same kind of inquiry, the burden of persuasion falls on the defendant under the plain error analysis. *Thurow*, 203 Ill. 2d at 363. The application of plain error or harmless error review depends on whether the defendant has forfeited review of the issue. *Thompson*, 238 Ill. 2d at 611.

¶ 42    Generally, "a defendant must object to the alleged error when it occurs and raise the issue in a posttrial motion" to preserve an issue for review. *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 76 (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). A timely made objection permits the trial court the opportunity to correct any error. *People v. Denson*, 2014 IL 116231, ¶ 13. Although the record shows that defendant raised an objection at trial and raised the issue again in a written posttrial motion, defendant's objection was not timely made as it was raised after the State presented all its evidence, as opposed to at the point in the proceedings when the error occurred, which in this case was before opening statement. The timely objection would have permitted the trial court the opportunity to then take corrective action. It is also worth noting that defendant appears to have noticed the error and raised an objection as a result of and only after the court informed the parties that the jury had not been sworn. Therefore, we find that defendant forfeited his claim by failing to timely object at trial. Accordingly, we review defendant's forfeited claim under the plain error doctrine.

¶ 43    Before proceeding, however, we pause to address defendant's additional contention that that once counsel motioned for a mistrial, the court was required to allow the motion unless the parties could agree to proceed otherwise. Defendant finds support for his position in an early case decided by the Michigan Court of Appeals, *People v. Pribble*, 249 N.W.2d 363 (Mich. Ct. App.

1976). In *Pribble*, the jury had not been sworn at the commencement of trial. *Id.* at 364. All but one of the prosecutions witnesses had testified prior to the jury being released for lunch. *Id.* Upon the jury's return, the court, on its own motion, declared a mistrial and dismissed the jury. *Id.* at 364-65. On appeal, the defendant asserted double jeopardy as a bar to retrial. *Id.* at 365. In its analysis, the reviewing court commented that it was possible that the parties and the court could have agreed to swear the jury at the time the error was discovered. *Id.* at 367-68. However, "[i]f the parties could not agree to this then the trial court could not have continued the trial. The defect should not be correctable without the consent of all." *Id.*

¶ 44    We know of no case in Illinois, and defendant points to none, wherein the trial court is prohibited from acting, except upon the concurrence of the parties. Although it is not unusual for the trial court to invite the opinions of the parties in addressing issues as they arise at trial, it is ultimately for the trial court, as the final arbiter in those proceedings, to decide the best way to proceed. The court is not bound to follow the suggested remedy of either party for the cure of an identified error. See *People v. Kelly*, 66 Ill. App. 2d 204, 209 (1965).

¶ 45    Embedded in defendant's *Pribble* argument is his assertion that until the jury was sworn, he was entitled to waive his right to a jury trial. He takes the position that this right, coupled with double jeopardy concerns, should dictate our disposition here. We have no quarrel with the general proposition that a defendant enjoys the right to waive a jury trial. *People v. Zemblidge*, 104 Ill. App. 3d 654, 656 (1982). However, those are not the facts in this case. Defendant neither waived his right to trial by jury at the commencement of these proceedings nor at the point in the proceedings when he learned that the jury had not been sworn. The record is clear, prior to the commencement of trial, defendant exercised his right to be tried by a jury. Further, we note again, it was the trial judge, and not defendant, who noticed to the parties that the jury had not been

sworn. Thus, we find defendant's argument to be in the nature of a hypothetical and without any bearing on the issue of prejudice.

¶ 46    To the extent that defendant argues that this case presents a double jeopardy issue, we acknowledge that jeopardy attaches when a jury is sworn, whether or not a single witness is ever called to testify. See *Martinez*, 572 U.S. at 840. "[U]ntil that moment, a defendant is subject to no jeopardy, for the twelve individuals in the box have no power to convict him." *United States v. Green*, 556 F.2d 71, 72 (D.C. Cir. 1977) (citing *Breed v. Jones*, 421 U.S. 519 (1975), and *Serfass v. United States*, 420 U.S. 377 (1975)). "Jeopardy attaches at the time after which the defendant may not be [prosecuted again] on the same claim, whether the defendant is acquitted or convicted." *Moon*, 2020 IL App (1st) 170675, ¶ 65 (citing *Crist v. Bretz*, 437 U.S. 28, 38 (1978)). Here, the facts show that the jury was indeed sworn, but belatedly and prior to deliberations. Because the jury was sworn in during trial, we find that jeopardy attached at that moment and bars defendant from being reprosecuted for the same claim at issue in the trial. Our finding that jeopardy has attached is a factor favorable to defendant. As the proceedings below did not conclude with a mistrial, absent our remand for a new trial, the facts of this case do not present a jeopardy issue.

¶ 47    Returning to our plain error analysis, we note the now-familiar principles of the doctrine. The plain error doctrine allows a court to review a forfeited error where

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error threatens to tip the scales of justice against the defendant, regardless of the seriousness of the error; or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Jackson*, 2015 IL App (3d) 140300, ¶ 54.

¶ 48    We begin our plain error analysis by reiterating that the failure to administer the oath prior to trial was clear error. Relying on *People v. Naylor*, 229 Ill. 2d 584 (2008), defendant argues that the first prong was satisfied here because the evidence was "closely balanced" and involved a "credibility contest" between the uncorroborated testimonies of the two officers and defendant. We disagree. In *Naylor*, our supreme court found the evidence was "closely balanced" because it was based on the credible testimony of two police officers that defendant sold drugs and the credible testimony of defendant that he was swept up in a drug raid. Id. at 606-07. However, "*Naylor* does not stand for the proposition that evidence is 'closely balanced' whenever the defense version of events differs from the State's version and the accounts are 'equally consistent with the physical evidence.' " *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 88. More importantly, even were we to find that the evidence here was closely balanced, and we hasten to add that it was not, the error itself (*i.e.*, the delay in administering the oath) did not threaten to tip the scales of justice against the defendant. Unlike *Naylor*, where the error (admission of a prior conviction for impeachment) may have influenced the trial court's credibility determination and the error—as opposed to the evidence—resulted in the conviction, the delay in administering the oath here did not to have the same effect. Other than defendant's protestations to the contrary, in the face of the trial judge's several admonishments to the jury, there is no basis upon which to conclude that the verdict resulted, in any way, from the later sworn jury.

¶ 49    As to the second prong, the error was not so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. Moreover, the oath is not the sole guarantee that the jury will be fair and impartial. Here, the jury was immediately sworn after the trial court noticed the error and before deliberations. After the jury was sworn, the trial court instructed the jurors to raise their hands "if [they] cannot view the testimony and evidence that [they] heard prior

to being sworn in the same [manner] as after being sworn in." The record reflects no juror raised his or her hand. There was also no indication in the record of an improper conversation or activity by the jurors during the period before the administration of oath. Additionally, like the court in *Abadia*, we find that the trial court's pretrial instructions imparted the same instruction that the verdict be rendered based on the evidence presented in court and directed the jurors to set aside any "sympathy, bias, or prejudice." See *Abadia*, 328 Ill. App. 3d at 677 (finding a trial proceeding was untainted because "[a]ll the concepts required by our system of justice to be communicated to a juror were effectively imparted in these pretrial instructions"). Defendant has therefore failed to show how the belated swearing of the jurors affected the fairness of defendant's trial and challenged the integrity of the judicial process.

¶ 50     We believe our analysis is consistent with the court's analysis in *Moon* and thus aids in the development of a consistent body of law in Illinois on this issue. In *Moon*, this court reviewed the trial court's error in failing to give the trial oath under the plain error doctrine. *Moon*, 2020 IL App (1st) 170675, ¶ 44, *appeal allowed*, No. 125959 (Ill. Sept. 30, 2020). The court found that, although the jury was never sworn, the jury was not completely unsworn as "[i]t was administered an oath *** after the jury was selected and before opening statements and testimony." *Id.* ¶ 43. However, the court stated that it " [could not] find anything but clear error in the defective wording of that oath." *Id.* The court reiterated that there was "clear error," but not "plain error" because the evidence was not closely balanced and the error did not affect the fairness of trial or challenge the integrity of the judicial process as the court's instructions and admonishments "addressed the purposes of the trial oath." *Id.* ¶¶ 45-46.

¶ 51    In sum, we find that, although the trial court's failure to administer the oath to the jurors at the start of the trial constituted clear error, it was not plain error. Accordingly, we find no abuse of discretion in the trial court's denial of defendant's motion for a mistrial.

¶ 52                    B. Sufficiency of the Evidence

¶ 53    Defendant next argues that his conviction should be reversed because no rational trier of fact would have convicted him for delivery of a controlled substance based on the evidence presented. Specifically, defendant argues that (1) neither the prerecorded funds nor narcotics were found on defendant after the transaction, (2) officers' testimony was inconsistent, and (3) Officer Lepine's testimony regarding the unlocated third individual who took the prerecorded funds "strains credulity."

¶ 54    In reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Hardman*, 2017 IL 121453, ¶ 37. "Circumstantial evidence is sufficient to sustain a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Campbell*, 146 Ill. 2d 363, 379 (1992). Testimony of a single witness is also sufficient to sustain a conviction. See *People v. Harris*, 2018 IL 121932, ¶ 27 (testimony of single witness is sufficient to convict if positive and credible). The trier of fact may consider inferences that flow naturally from the evidence; however, the trier of fact is not required to "search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Campbell*, 146 Ill. 2d at 380. All reasonable inferences from the evidence must be drawn in favor of the prosecution. *Hardman*, 2017 IL 121453, ¶ 37. This court cannot substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *People*

*v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). A reversal is warranted only when the evidence is so "unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 55 In the present case, defendant was charged with delivery of "1 gram or more but less than 15 grams of any substance containing heroin." 720 ILCS 570/401(c)(1) (West 2014). To sustain a conviction for delivery of a controlled substance, the State is required to prove that the defendant knowingly delivered a controlled substance. *Id.* § 401; *People v. Brown*, 388 Ill. App. 3d 104, 108 (2009). " '[D]elivery' " means "actual, constructive or attempted transfer of possession of a controlled substance, with or without consideration, whether or not there is an agency relationship." 720 ILCS 570/102(h) (West 2014).

¶ 56 Defendant argues that the fact that he did not have any narcotics or prerecorded funds in his possession was circumstantial evidence that he was not involved in such transaction. However, there is "no requirement that prerecorded or marked funds used in a narcotics transaction be recovered for a conviction to stand." *People v. Trotter*, 293 Ill. App. 3d 617, 619 (1997). Additionally, we note that " '[d]eterminations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact.' " *People v. Emerson*, 189 Ill. 2d 436, 475 (2000) (quoting *People v. Nitz*, 143 Ill. 2d 82, 95 (1991)). Here, Officer Ugarte testified that he engaged in a narcotics transaction with defendant, whereby defendant gave him three bags which was confirmed by forensics to contain heroin. He testified that the transaction took place during daylight, which made his identification of defendant more reliable. Officer Lepine testified in a similar manner, which corroborated Officer Ugarte's testimony. Officer Lepine stated that he observed the transaction take place and even testified as to why the prerecorded funds were not recovered. As such, the jury could have

drawn inferences on what happened to the prerecorded funds based on the testimony of the two officers.

¶ 57    Next, defendant contends that the evidence was insufficient because there were inconsistencies between Officers Ugarte's and Lepine's testimonies. Defendant argues that the officers "failed to get their story in lockstep on one crucial fact: where [defendant] purportedly went after he interacted with [Officer Ugarte]." Defendant points out that Officer Ugarte testified that "[defendant] went to Stevenson, who was about four building north" from him, whereas Officer Lepine testified that they were "right across the street, maybe two or three feet north." However, we note that a reversal is unwarranted even where witnesses do not have identical description of a criminal offense. See *People v. Bradford*, 187 Ill. App. 3d 903, 916 (1989) ("[m]inor inconsistencies in testimony do not constitute grounds for reversal of a criminal conviction"). As such, we find that there was sufficient evidence to support defendant's conviction. Finally, defendant argues that Officer Lepine's testimony regarding the unlocated third individual who took the prerecorded funds "strains credulity." However, it is the role of jury to determine the weight to be given to Officer Lepine's testimony and any reasonable inferences to be drawn from it. Therefore, when viewed in the light most favorable to the State, we find the evidence was more than sufficient to support defendant's conviction.

¶ 58                                    III. CONCLUSION

¶ 59    For the reasons stated, we affirm the judgment of the circuit court.

¶ 60    Affirmed.

---

**No. 1-18-1483**

---

| | |
|---|---|
| **Cite as:** | *People v. Nelson*, 2021 IL App (1st) 181483 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-12028(02); the Hon. Mauricio Araujo, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Christofer R. Bendik, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Douglas P. Harvath, and Matthew E. Thrun, Assistant State's Attorneys, of counsel), for the People. |

---